**MT. VERNON TANKER COMPANY,
Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 75–2580.

United States Court of Appeals,
Ninth Circuit.

Mar. 4, 1977.

Robert E. Fremlin and Craig E. Epperson, Lillick, McHose & Charles, San Francisco, Cal., William M. Jensen, Royston, Rayzor, Cook & Vickery, Houston, Tex., Martin C. Seham, Surrey, Karasick, Morse & Seham, New York City, argued, for petitioner.

Elliott Moore, General Counsel, N.L.R.B. Regional Director, Peter M. Bernstein, Atty., Washington, D.C., argued, for respondent.

Before MERRILL, KILKENNY and ANDERSON, Circuit Judges.

OPINION

MERRILL, Circuit Judge:

The sole question presented is whether it is a violation of § 8(a)(1) of the National Labor Relations Act to require a seaman, without the presence of a union representative, to take part in a "logging" (a proceeding in which the seaman is given notice of entries in the ship's log relating to misconduct with which he is charged). The N.L.R.B. found that this constituted an unfair labor practice in violation of § 8(a)(1), 29 U.S.C. § 158(a)(1). *Mt. Vernon Tanker Co.,* 218 N.L.R.B. 1423 (1975). The Board reached its decision by applying *NLRB v. J. Weingarten, Inc.,* 420 U.S. 251, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975) to the facts of this case. We find *Weingarten* to be inapposite. We deny enforcement and set aside the Board's order.

On the morning of October 23, 1973, while the S.S. *Mount Vernon Victory* was riding at anchor off Chittagong, Bangladesh, crew members Lial and Flores were in

the engine room's machine shop attempting to fabricate a part for a deck winch. While the two men were thus engaged, Chief Engineer Donald H. Collins accused Lial of wasting time and ordered him to leave the engine room and return to the deck. Lial refused to leave. Collins then reported the incident to the ship's master, Captain Carl H. Hope, asserting that Lial had directed obscene epithets at him along with his refusal to leave the engine room.

Upon hearing the chief engineer's report, Captain Hope proceeded to the engine room machine shop, where he ordered Lial to "get out of the machine shop and go topside," adding that Lial "would be logged for willful disobedience of Collins' command and that [he] would send for [Lial] when the log was written up." [1]

About an hour later, Captain Hope sent a crew-member to summon Lial to the captain's office. Captain Hope, Chief Engineer Collins, and First Assistant Engineer James Edson were waiting in Hope's office when Lial arrived with James Schilling, the union's engine room delegate. When Hope questioned Schilling's presence, Schilling responded that he was a union representative and would act as Lial's witness. At this Captain Hope told Lial that Schilling's presence was not necessary for the logging because this was not a matter for the union and directed Schilling to leave the office.

As Schilling started to leave, Lial followed suit, but Hope ordered Lial to remain "so the log could be read to him." Lial persisted in his refusal, asserting that "this was a union ship and he was entitled to union representation." Lial left the office and Hope went after him and ordered him to return to the office. Lial refused to do so without his "union representative as a witness." At this, Captain Hope handcuffed Lial and led him below to the ship's hospital. When Lial again refused to go to the captain's office without a union representative, Hope ordered him into confinement in the hospital and put him on bread and water "until his disobedience ceased." [2]

On the following day, when approached by the captain, Lial persisted in his disobedience of the captain's order to attend the logging. On the morning of October 25 Hope returned and again pressed Lial to obey his order. Lial agreed to come to the office if Hope permitted him to bring a union witness and if Collins would not be present at the logging. Hope consented to Lial's terms and released him from confinement.

Later in the morning Lial went to Hope's office. Schilling could not leave his duties, so Lial chose the second pumpman to be his witness. The log entry regarding his refusal to leave the engine room on October 23 and the two log entries regarding his refus-

1. Logging is a procedure mandated by statute:

"Upon the commission of any of the offenses enumerated in section 701 of this title an entry thereof shall be made in the official log book on the day on which the offense was committed, and shall be signed by the master and by the mate or one of the crew; and the offender, if still in the vessel, shall, before her next arrival at any port, or, if she is at the time in port, before her departure therefrom, be furnished with a copy of such entry, and have the same read over distinctly and audibly to him, and may thereupon make such a reply thereto as he thinks fit; and a statement that a copy of the entry has been so furnished, or the same has been so read over, together with his reply, if any, made by the offender, shall likewise be entered and signed in the same manner. In any subsequent legal proceedings the entries hereinbefore required shall, if practicable, be produced or proved, and in default of such production or proof the court hearing the case

may, at its discretion, refuse to receive evidence of the offense."
46 U.S.C. § 702.

2. The propriety of this punishment is not before us. 46 U.S.C. § 701 provides, in part:

"Whenever any seaman who has been lawfully engaged * * * commits any of the following offenses, he shall be punished as follows:

\* \* \* \* \* \*

Fifth. For continued willful disobedience to lawful command or continued willful neglect of duty at sea, by being, at the option of the master, placed in irons, on bread and water, with full rations every fifth day, until such disobedience shall cease, and upon arrival in any port by forfeiture, for every twenty-four hours' continuance of such disobedience or neglect, of a sum of not more than twelve days' pay, or by imprisonment for not more than three months, at the discretion of the court."

als to return to the captain's office on October 23 and 24 were read to him. Hope gave a copy of each logging to Lial. In the first logging Hope fined Lial four days' wages, amounting to $110. In the second and third loggings Hope fined Lial a total of sixteen days' wages, amounting to $440.

On November 1, following diagnosis and treatment of a wrist injury Lial had suffered prior to the foregoing events, a local physician recommended that he be left ashore at Chittagong for repatriation and Captain Hope complied with that recommendation.

On December 3, 1973, approximately one month after Lial's departure from the ship, the company filed a grievance with the contractually established Seafarers Appeals Board claiming, under the contract, that Lial's "presence aboard contracted vessels [is] a menace and a nuisance to the rest of the crew" and requesting contractual discipline. In support of its claim the company enclosed copies of the log book entries and quoted from a letter from Captain Hope: "He created nothing but trouble aboard and did not do one good day's work the entire time he was aboard." Lial was notified of the charges by mail and a hearing was scheduled before a hearing committee of the contractual Seafarers Appeals Board consisting of one management and one union representative. After the hearing was conducted the committee found Lial guilty with respect to his logged failures to obey lawful commands and recommended that he be placed on probation for eighteen months commencing January 4, 1974. On December 18, 1973, Lial filed his unfair labor practice charge with the N.L.R.B.

Relying on *J. Weingarten, Inc.,* 202 N.L.R.B. 446 (1973), and *Quality Mfg. Co.,* 195 N.L.R.B. 197 (1972),[3] the administrative law judge ruled that petitioner had violated § 8(a)(1) of the National Labor Relations Act by ordering Lial to submit, without union representation, to an interview which he reasonably feared might result in his discipline. After the administrative law judge's decision, the Supreme Court upheld the Board's decisions in *Weingarten* and *Quality Mfg.*[4] The N.L.R.B. affirmed, and the petition and cross petition herein followed.

In our judgment *Weingarten* does not apply under the facts of this case. *Weingarten* was a case in which a company that was engaged in the operation of lunch counters suspected an employee of helping herself to food without paying for it. She was called for questioning. She requested the presence of a union representative but it was denied by the company. The interview was conducted by a "Loss Prevention Specialist" employed by the company who reported that the employee owed the company $160 for free lunches appropriated by her. The company felt that the right of employees to free lunches, or the lack of such right, was not clearly established by company policy and so the company did not press the matter against the employee. The employee, however, reported the incident to her shop steward and an unfair labor practice charge was duly filed. The Board found a violation of the N.L.R.A., the court of appeals disagreed, but the Supreme Court reversed and directed enforcement of the Board's order.

The unfair labor practice found by the Board in *Weingarten,* and the one charged in the case before us, was the one specified in § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1):

"[T]o interfere with, restrain, or coerce employees in the exercise of the rights guaranteed under section 157 of this title;"

---

3. At the time of the administrative law judge's decision, enforcement of the Board's decision in *Weingarten* had been denied, 485 F.2d 1135 (5th Cir. 1973), but certiorari had been granted by the Supreme Court, 416 U.S. 969, 94 S.Ct. 1990, 40 L.Ed.2d 557 (1974). The same was true of *Quality Mfg., enforcement denied,* 481 F.2d 1018 (4th Cir. 1973), *cert. granted sub* *nom. Int'l Ladies' Garment Workers Union v. Quality Mfg. Co.,* 416 U.S. 968, 94 S.Ct. 1990, 40 L.Ed.2d 557 (1974).

4. *N.L.R.B. v. J. Weingarten, Inc.,* 420 U.S. 251, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975); *Int'l Ladies Garment Workers' Union v. Quality Mfg.,* 420 U.S. 276, 95 S.Ct. 972, 43 L.Ed.2d 189 (1975).

**574**

29 U.S.C. § 157 (§ 7 of the Act), so far as pertinent here, provides:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection * * *."

The Court in *Weingarten* discussed the statutory right that the Board had construed § 7 to create: a "right in an employee to refuse to submit without union representation to an interview which he reasonably fears may result in his discipline * * *." 420 U.S. at 256, 95 S.Ct. at 963. The Court upheld the Board's construction of § 7 and stated:

"*First,* the right inheres in § 7's guarantee of the right of employees to act in concert for mutual aid and protection. * * *

* * * * * *

*Second,* the right arises only in situations where the employee requests representation. * * *

*Third,* the employee's right to request representation as a condition of participation in an interview is limited to situations where the employee reasonably believes the investigation will result in disciplinary action. * * *

* * * * * *

*Fourth,* exercise of the right may not interfere with legitimate employer prerogatives. * * * [The employer may forego the interview rather than submit to one in the presence of a union representative and may thereafter act on the basis of information obtained from other sources.]

*Fifth,* the employer has no duty to bargain with any union representative who may be permitted to attend the investigatory interview. * * *"

*Id.* at 256–59, 95 S.Ct. at 963.

After discussing the nature of the statutory right emerging from the Board's construction of § 7, the Court stated: "The Board's holding is a permissible construction of 'concerted activities for * * * mutual aid or protection' * * *." *Id.* It noted the intent of the Act, "to eliminate the 'inequality of bargaining power between employees * * * and employers.'" *Id.* at 262, 95 S.Ct. at 966. It stated:

"Requiring a lone employee to attend an investigatory interview which he reasonably believes may result in the imposition of discipline perpetuates the inequality the Act was designed to eliminate, and bars recourse to the safeguards the Act provided 'to redress the perceived imbalance of economic power between labor and management.'"

*Id.*

For two reasons (petitioner assigns others with which we need not deal) we are of the view that *Weingarten* cannot be held to apply under the facts of this case.[5]

■ *First,* in our judgment, the logging that Lial refused to attend was not an investigatory interview reasonably likely to result in discipline in the sense in which "investigatory interview" is used in *Weingarten*.[6] Lial was initially charged with willful disobedience of a lawful order. Willful disobedience by a seaman to any lawful command at sea is a statutory offense that carries penalties akin to those imposed for crimes. The penalties may be imposed aboard ship at the order of the

---

5. Our holding in this respect makes it unnecessary for us to decide whether the rule of that case should have retroactive application.

6. The question has not been raised and we do not consider whether a logging might be considered a "disciplinary interview" and, if so,

whether an employee or a seaman might have the right to a representative in such an interview. *See N.L.R.B. v. J. Weingarten, Inc.,* 420 U.S. 251, 260, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975); *N.L.R.B. v. Columbia Univ.,* 541 F.2d 922, 931 (2d Cir. 1976).

captain, or on shore in the discretion of a court.[7]

A logging is not an interview instigated for the purpose of ascertaining whether an offense has been committed. It occurs after that question has been settled to the captain's satisfaction. It is a proceeding in which the commission of the offense is formally noted and the seaman is given notice of the charges entered against him, as to which he may, on termination of the voyage, be held to answer in shoreside proceedings.[8] The outcome of the proceeding does not depend upon the showing that may be made by the seaman with or without the aid of concerted activity. The result from the outset is a foregone conclusion; from the outset, all that remains to be accomplished is the formality or ceremony itself and the notice to the seaman that results. The proceeding is mandated by law and the captain, as master of the ship, cannot exercise the employer's usual prerogative to dispense with interview.

*Second,* even if it be conceded that the logging was an investigatory interview in the sense in which that term is used in *Weingarten,* a statutory right in a seaman to refuse to submit to it without union representation under § 7 of the National Labor Relations Act cannot be said to exist in the maritime context that we have here.

The basis on which the Board and the Supreme Court found such a right to exist in the shoreside context was explicitly noted by the Supreme Court. It was not founded on any right to fair hearing procedures comparable to constitutional due process. Rather, it was founded on the right bestowed by § 7 of the Act to "engage in * * * concerted activities for the purpose of * * * mutual aid or protection * * *." The question is whether the right here asserted can, on such foundation, be said to exist on the part of seamen during the course of a ship's voyage. In our judgment it cannot.

During the course of a voyage the *normal* employer-employee relationship is suspended. In a sense the captain is a representative of the employer. But his predominant role at sea is that of master of the ship. He is charged with responsibility for the safety of ship, cargo and crew. To discharge this responsibility Congress has seen fit to give him authority to maintain strict discipline.

A charge of seaman disobedience during the course of a voyage is not an assertion of "economic power" on the part of an employer; it does not involve the ongoing struggle between labor and management in which the Board appropriately can intervene in an effort to redress perceived imbalances. Rather, such a charge is an assertion of disciplinary authority on the part of one charged by law with responsibility for the safety of a vessel. The unquestioned imbalance in favor of the master of the ship that exists aboard ship during the course of a sea voyage exists in the public interest and pursuant to statute, and it does not lie with the Board to seek to achieve equality of power under these circumstances.

Labor practices appropriate in the normal industrial context can be wholly inappropriate at sea and it may be doubted that concerted activities of seamen for mutual aid or protection, when in opposition to the directions of a ship's master, are to be tolerated at all during the course of a voyage. We know that some activities protected under the National Labor Relations Act in the ordinary industrial setting—e.g., a strike to protest what is conceded to be an unfair labor practice by the employer—are not protected and can even constitute the crime of mutiny when they occur aboard a ship away from its home port. *Southern S. S. Co. v. N.L.R.B.,* 316 U.S. 31, 62 S.Ct. 886, 86

---

**7.** 46 U.S.C. § 701 provides, in part:

"Fourth. For willful disobedience to any lawful command at sea, by being, at the option of the master, placed in irons until such disobedience shall cease, and upon arrival in port by forfeiture from his wages of not more than four days' pay, or, at the discretion of the court, by imprisonment for not more than one month." *See also* note 2, *supra.*

**8.** *See* 1 M. Norris, *The Law of Seamen,* §§ 128, 132–138 (3d ed. 1970); and note 1, *supra.*

L.Ed. 1246 (1942). In that case the Court stated:

> "Ever since men have gone to sea, the relationship of master to seaman has been entirely different from that of employer to employee on land. The lives of passengers and crew, as well as the safety of ship and cargo, are entrusted to the master's care. Every one and every thing depend on him. He must command and the crew must obey. Authority cannot be divided. These are actualities which the law has always recognized. On the one hand, it has imposed numerous prohibitions against conduct by seamen which destroys or impairs this authority. * * * On the other hand, workers at sea have been the beneficiaries of extraordinary legislative solicitude, undoubtedly prompted by the limits upon their ability to help themselves. The statutes of the United States contain elaborate requirements with respect to such matters as their medicines, clothing, heat, hours and watches, wages, and return transportation to this country if destitute abroad. U.S.C., Title 46, §§ 651–692, 1131."

316 U.S. at 38–39, 62 S.Ct. at 890.

The Court also made clear:

> "[T]he Board has not been commissioned to effectuate the policies of the Labor Relations Act so single-mindedly that it may wholly ignore other equally important congressional objectives."

Id. at 47, 62 S.Ct. at 894.

In our judgment, then, in this maritime context, the policies reflected by the provisions of title 46 with reference to the relationship between master and seaman during the course of a sea voyage must be held to control.

■ We conclude that insistence upon the seaman's attendance at logging without the presence of a union representative did not constitute an unfair labor practice.[9]

9. This is not to say that an order of a captain, given during the course of a voyage, that does amount to an unfair labor practice may not form the basis of charges against the employer once the voyage has been completed. We hold here only that the conduct of the captain did not constitute an unfair labor practice.

Accordingly the order of the Board is not entitled to enforcement. The petition to vacate is granted.