**ALFRED M. LEWIS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 77–2217.

United States Court of Appeals, Ninth Circuit.

Sept. 13, 1978.

Rehearing Denied Dec. 4, 1978.

Raymond M. Hunter, of Ryley, Carlock & Ralston, Phoenix, Ariz., for petitioner.

Joseph A. Oertel, Washington, D. C., for respondent.

Before CHOY and KENNEDY, Circuit Judges, and HALL,* District Judge.

KENNEDY, Circuit Judge:

Alfred M. Lewis, Inc. (Company) petitions for review of an order of the National Labor Relations Board (Board), and the Board by cross-application seeks enforcement of its order.[1] This court has jurisdiction under sections 10(e) and (f) of the National Labor Relations Act (NLRA or Act), 29 U.S.C. § 160(e)–(f), since the underlying unfair labor practices occurred in Phoenix, Arizona.

The Company operates four wholesale grocery warehouses, including one located in Phoenix. The warehouse and trucking employees at the Phoenix warehouse are represented by Transport and Local Delivery Drivers, Warehousemen and Helpers, Local 104 (Union). In its warehouses the Company employs "order runners" who drive lift trucks through the warehouse aisles, collecting merchandise listed on an

---

* Honorable Peirson M. Hall, Senior United States District Judge for the Central District of California, sitting by designation.

1. The Board's decision and order is published at 229 N.L.R.B. No. 116 (1977).

order and depositing the items at a loading dock for delivery to the Company's customers. For several years, order runners at the Phoenix warehouse have achieved lower production rates than order runners at the Company's other warehouses. In early 1975 the Company began what it designated an "informal" program of employee counseling in an effort to improve production. In March, 1975, after this procedure had failed to obtain the desired results, the Company unilaterally instituted a formal program of supervisory counseling of order runners whose output was five percent or more below the crew average.[2] In July of 1975, the Company adopted provisions for disciplining employees who consistently failed to meet the production standards.[3] Furthermore, on August 7, 1975, the Company unilaterally terminated its policy of permitting employees to have union representation at counseling and disciplinary procedures. The crew average concept of production quotas was abandoned by the Company in late March, 1976 and a set of engineered standards was adopted instead.[4]

Pursuant to the program, the Company discharged and suspended some employees.[5] The Union filed grievances with respect to each of these disciplinary actions and processed the first two complaints through arbitration. The arbitrator's awards upheld the disciplinary actions. After receiving these two unfavorable decisions, the Union chose not to arbitrate the remaining grievances.

During the pendency of the arbitration proceedings, individual employees filed charges with the Board alleging that the Company had committed unfair labor practices. Complaints, which were later consolidated, were issued by the regional director, charging that the Company had violated the Act by imposing the production standards system without first bargaining with the Union and by adopting the policy of forbidding union representation at counseling and disciplinary sessions.[6] One of the

2. The Company's procedure for counseling was as follows:

 PROCEDURE FOR ORDER RUNNER
 COUNSELING

 (1) Counseling should be done in the work area, not in the office. It should be informal and done in a constructive manner. The purpose of talking to the employee is to *help* him improve his production.

 (2) All order runners below 5% of the crew average must be talked to nightly and a written record kept. Nothing should be mentioned about written warning, suspension or termination. Training should be stressed. Ride with and instruct these people to show them how to increase their production. Be sure to convey the message that you are trying to help in a constructive way and not as a punishment or punitive measure.

 (3) Write your records after you have talked to, or instructed the order runner. Date your records, record time spent with the person, note his attitude and any relevant remarks.

 (4) Compile, at the end of each work week, a list of all employees who have been counselled.

 (5) *DO NOT* mention standards.

 (6) Discuss with the superintendent of operations those employees who have been on the weekly list two or [sic] the four weeks in each calendar month.

 Record, vol. I, at 297–98 (emphasis in original).

3. Under the disciplinary provisions, an employee received an oral warning and counseling the first week he failed to meet the production standards (*i. e.*, at least 95% of the crew average). If the employee failed to attain the standard for a second week, the warning and counseling were repeated. A third week of below quota production resulted in a three-day suspension, and an employee who failed to meet the stated minimum for a fourth week would be discharged.

4. The new standards were production quotas based on engineering studies.

5. Through December 1975 the Company had suspended ten employees and discharged three.

6. Sections 8(a)(1) and 8(a)(5), 29 U.S.C. § 158(a)(1) & (5), provide:

 It shall be an unfair labor practice for an employer—

 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title [§ 7 of the Act];

 . . . . .

 (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title [§ 9(a) of the Act].

complaints was amended to allege that the Company further violated the Act by instituting the engineered quota system in March of 1976 without first bargaining with the Union.

On April 15 and 16, 1976 the unfair labor practice charges were tried before an administrative law judge. In his decision issued July 30, 1976, the administrative law judge held that the Board's principle of deference to arbitration proceedings under *Spielberg Manufacturing Co.*, 112 N.L.R.B. 1080 (1955), precluded Board action for possible violations arising out of the institution of the production standards system. The administrative law judge also concluded that the engineered quota system had not been shown to be a material change from that which was required of the employees under the production standards system and alternatively that *Spielberg* deference was proper. The administrative law judge did find that the Company's refusal to permit union representation at disciplinary sessions violated section 8(a)(1), but that no representation was required at counseling sessions preliminary to disciplinary action. Finally, the administrative law judge held that the complaint failed to allege that the change in policy concerning union representation violated sections 8(a)(5) and 8(a)(1).

The Board issued its decision on May 18, 1977 and partially overruled the decision of the administrative law judge. The Board held that (1) the Company violated sections 8(a)(5) and 8(a)(1) when it instituted the production standards system, the engineered quota system, and the change in policy concerning union representation without first bargaining with the Union; (2) deference to the arbitration proceedings was not warranted; and (3) the denial of union representation at counseling sessions and disciplinary proceedings violated section 8(a)(1). To remedy these violations, the Board ordered the Company to cease and desist from engaging in the cited unfair labor practices, required the Company to rescind the engineered quota and discipli-

nary systems,[7] and ordered it to restore the *status quo ante* by reinstating all employees discharged as a result of the quota and disciplinary systems, making those employees whole for lost wages plus interest, and removing from employee files disciplinary memoranda resulting from the quota and disciplinary systems.

We first consider whether the Board abused its discretion in refusing to defer to the arbitration process. Section 10(a) of the Act, 29 U.S.C. § 160(a), empowers the Board to prevent the commission of unfair labor practices and expressly provides that that power "shall not be affected by any other means of adjustment" which may be established. Nonetheless, the Board may defer to an arbitration award and decline to exercise authority over alleged unfair labor practices in an appropriate case. *Carey v. Westinghouse Electric Corp.*, 375 U.S. 261, 270–72, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964); *Stephenson v. NLRB*, 550 F.2d 535, 537 (9th Cir. 1977). The Board established criteria for determining when to defer to arbitral awards in *Spielberg Manufacturing Co.*, 112 N.L.R.B. 1080 (1955). In the instant case, the Board's decision squarely relied on the *Spielberg* criterion that deference to arbitration will not be given where the arbitral award is repugnant to the purposes and policies of the Act. The Board's characterization of the award and consequent refusal to defer will be reversed on review only when the Board abuses its wide discretion. *Hawaiian Hauling Service, Ltd. v. NLRB*, 545 F.2d 674, 676 (9th Cir. 1976), *cert. denied*, 431 U.S. 965, 97 S.Ct. 2921, 53 L.Ed.2d 1061 (1977).

Both arbitration decisions concluded in relevant part that the production quota system was reasonable and that the Company had the right to introduce such a system without prior bargaining with the Union. The Board refused to defer to these rulings on the ground that the arbitrator "ignored well-established Board precedent holding exactly to the contrary." We agree with

---

7. Since the original production quota system had been superseded by the engineered quota

system, the Board did not order that it be rescinded. See 229 N.L.R.B. No. 116 at 8 n.5.

the Board that in this case the arbitrators ignored well-established principles of labor law, and we rule that the Board committed no abuse in refusing to defer to the arbitration awards.

■ Under section 8(a)(5), the duty to bargain collectively requires bargaining with respect to "wages, hours, and other terms and conditions of employment." NLRA § 8(d), 29 U.S.C. § 158(d). A production quota system and disciplinary sanctions are subjects that are within this statutory category and an employer violates section 8(a)(5) by unilaterally imposing such work rules without first bargaining. *NLRB v. Miller Brewing Co.*, 408 F.2d 12 (9th Cir. 1969); *Boland Marine and Manufacturing Co.*, 225 N.L.R.B. 824 (1976); *Donna Lee Sportswear*, 174 N.L.R.B. 318 (1969). By failing to bargain before instituting the quota and disciplinary systems, the Company clearly violated section 8(a)(5), and the Board did not abuse its discretion in refusing to give deference to the arbitrator's award.

■ The Company argues that the grievance procedure used by the Union to challenge the quota system was itself a bargaining mechanism; it follows, the Company contends, that there was adequate bargaining when the Union utilized this grievance process. We reject this theory. In these circumstances arbitration concerning the propriety or fairness of the Company's policy after it had been put into effect was not a substitute for bargaining between the Company and the Union as to whether the policy should be adopted in the first instance.

An essential aspect of the Union's role in collective bargaining is its right to be consulted by the employer about mandatory subjects of bargaining and to make comments, objections, or suggestions to the employer before action is taken. This is a practical mechanism to insure the stability of industrial relations. The Board correctly held that the employer disregarded it here. It would wholly undercut the duty to bargain if the employer were allowed to act with reference to a mandatory bargaining subject and then simply defend its actions in a later arbitration hearing. Aside from wages and hours, production quotas are among the most important of the conditions of employment. The Company cannot avoid an unfair labor practice charge by claiming that grievance procedures after the fact were an adequate substitute for its duty to bargain with the Union before instituting the quota systems challenged here.

■ The Company contends that the employee should not be allowed to bring an unfair labor practice charge since the Union chose to rest on the arbitration awards. It argues that to grant relief on these individual complaints would undermine the Union's authority as the exclusive bargaining representative. We disagree.

Section 7 of the Act, 29 U.S.C. § 157, gives employees the right to bargain collectively through their representative, and section 9(a) of the Act, 29 U.S.C. § 159(a), provides that such representative is the exclusive bargaining agent of the employees. Employee action which interferes with the course of bargaining chosen by the union or which seeks to bypass the union entirely is prohibited. *See, e. g., Emporium Capwell Co. v. Western Addition Community Organization*, 420 U.S. 50, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975) (employees sought to have employer bargain directly with them rather than with their representative); *NLRB v. Universal Services, Inc.*, 467 F.2d 579 (9th Cir. 1972) (employees engaged in work stoppages without union authorization). As this court stated in *Universal Services* :

> The men were obligated to allow their bargaining representative to speak first on their behalf, and to restrain individual initiative. . . . [T]heir obligation to the union requires them not only to approach their leaders, but to allow the internal remedies thus implemented to run their course before preempting the union's bargaining, or . . . negotiating position.

467 F.2d at 586.

The employees in this action have not sought to inject themselves into the bar-

gaining process. The Company unilaterally established the production standards and disciplinary system without providing the Union an opportunity to bargain. Confronted with a *fait accompli,* the employees neither interfered with the Union's bargaining position nor sought to bargain directly with the Company. Rather, the complaining employees attempted to require the Company to fulfill its statutory duty to bargain with the Union before instituting the contested changes in the terms and conditions of employment. The Union remains free to adopt whatever bargaining posture it chooses. Under these circumstances, sections 7 and 9(a) do not forbid employees from filing unfair labor practice charges against their employer, and the Board did not err in considering the charges.

█ Next, the Company contends that the Board erred in holding that the unilateral adoption of the engineered quota system in March of 1976 constituted a violation of sections 8(a)(5) and 8(a)(1). Again we must disagree. Although the Union was given notice of this new quota system prior to its adoption, substantial evidence supports the Board's finding that the Company did not offer to bargain but merely informed the Union of an action which the Company intended to take notwithstanding any objections.[8] The Board did not err in determining that the Company had refused to bargain over a subject covered by the Act.

█ The administrative law judge excused this failure to bargain on the ground that the engineered quota system was not a

material change from the production standards system which he had ruled valid. The Board disagreed, holding that the engineered quota system was a distinct system and not merely an insubstantial modification of prior practice.[9] Without implying any error on the part of the Board, we believe that this determination is irrelevant. As discussed above, the Company breached its duty to bargain when it imposed the initial system. Therefore, even if the engineered quota system is a mere modification, it was improper to adopt it without bargaining because the underlying system itself was unlawfully instituted.

The Company also challenges the Board's holding that under *NLRB v. J. Weingarten, Inc.,* 420 U.S. 251, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975), the denial of union representation when requested at the counseling and disciplinary sessions violated section 8(a)(1). In *Weingarten,* the Supreme Court upheld the Board's construction of section 7 as creating a "right in an employee to refuse to submit without union representation to an interview which he reasonably fears may result in his discipline . . .." *Id.* at 256, 95 S.Ct. at 963. In so holding, the Court noted that the intent of the Act was "to eliminate the 'inequality of bargaining power between employees . . . and employers,'" *id.* at 262, 95 S.Ct. at 966, *quoting* NLRA § 1, 29 U.S.C. § 151 (elision in original), and that requiring union representation upon request when the employer chooses to have the interview go forward furthered that intent.[10] The Court stated that:

---

8. The administrative law judge did not consider this point. Therefore, the Board's finding must be accepted if supported by substantial evidence on the record considered as a whole. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

9. Since the disagreement between the administrative law judge and the Board does not turn on the credibility of witnesses, no special weight need be given to the conclusions of the administrative law judge. *Penasquitos Village, Inc. v. NLRB,* 565 F.2d 1074, 1076 (9th Cir. 1977). We must accept the Board's factual finding if it is supported by substantial evi-

dence. *NLRB v. Pacific Grinding Wheel Co.,* 572 F.2d 1343, 1347 (9th Cir. 1978).

10. As the Supreme Court explained:

Requiring a lone employee to attend an investigatory interview which he reasonably believes may result in the imposition of discipline perpetuates the inequality the Act was designed to eliminate, and bars recourse to the safeguards the Act provided "to redress the perceived imbalance of economic power between labor and management." *American Ship Building Co. v. NLRB,* 380 U.S. 300, 316, 85 S.Ct. 955, 966, 13 L.Ed.2d 855 (1965). Viewed in this light, the Board's recognition

The Board's construction also gives recognition to the right when it is most useful to both employee and employer. A single employee confronted by an employer investigating whether certain conduct deserves discipline may be too fearful or inarticulate to relate accurately the incident being investigated, or too ignorant to raise extenuating factors. A knowledgeable union representative could assist the employer by eliciting favorable facts, and save the employer production time by getting to the bottom of the incident occasioning the interview.

*Id.* at 262–63, 95 S.Ct. at 966 (footnote omitted).

■ Whether an investigatory interview may lead to disciplinary action is an objective inquiry based upon a reasonable evaluation of all the circumstances, not upon the subjective reaction of the employee. *Id.* at 257 n.5, 95 S.Ct. at 964. The Court in *Weingarten* quoted with approval the NLRB's statement that

We would not apply the rule to such run-of-the-mill shop-floor conversations as, for example, the giving of instructions or training or needed corrections of work techniques. In such cases there cannot normally be any reasonable basis for an employee to fear that any adverse impact may result from the interview, and thus we would then see no reasonable basis for him to seek the assistance of his representative.

*Id.* at 257–58, 95 S.Ct. at 964, *quoting Quality Manufacturing Co.,* 195 N.L.R.B. 197, 199 (1972). It should be acknowledged that a supervisory interview in which the employee is questioned or instructed about work performance inevitably carries with it the threat that if the employee cannot or will not comply with a directive, discharge or discipline may follow; but that latent threat, without more, does not invoke the right to the assistance of a union representative. The right of representation arises when a significant purpose of the interview is to obtain facts to support disciplinary action that is probable or that is being seriously considered.

■ In the instant case the counseling sessions were not simple shop-floor training. The Board found that the counseling was an integral part of the disciplinary system and was deemed by management to be a preliminary stage in the imposition of discipline. At least one employee was told that discipline would be the next step under the system. The Board also found that the counseling sessions "explored the reasons for an employee's failure to meet production quotas . . .," 229 N.L.R.B. No. 116 at 5 (1977), and the Company admits that employees were questioned at the counseling sessions as to whether they had experienced any problems which accounted for their poor production. The presence of an employee's representative at the interview would be of obvious benefit to the employee and in addition, the representative "could assist the employer by eliciting favorable facts" from a frightened, inarticulate, or ignorant employee. It is also relevant in our determination that the disciplinary system in question was imposed without collective bargaining. In this situation collective bargaining, the principal statutory mechanism for mutual aid, had been improperly denied; the atmosphere of intimidation and uncertainty was heightened and the justification for the fear that the interview would be used in significant part for disciplinary purposes was increased. We find substantial evidence for the Board's conclusion that the employees were entitled to the presence of a union representative.

As previously discussed, an employee was subject to suspension and termination under the Company's disciplinary program for continued failure to meet the quota. Prior to meting out the appropriate sanction, it was the Company's policy to advise the

---

that § 7 guarantees an employee's right to the presence of a union representative at an investigatory interview in which the risk of discipline reasonably inheres is within the protective ambit of the section " 'read in the light of the mischief to be corrected and the end to be attained.' " *NLRB v. Hearst Publications, Inc.,* 322 U.S. 111, 124, 64 S.Ct. 851, 88 L.Ed. 1170 (1944).

420 U.S. at 262, 95 S.Ct. at 966.

employee personally of the disciplinary action and the reason for it. According to testimony at the administrative hearing, these meetings were "cut and dried," without any employee interrogation. The Board held that under *Weingarten* union representation must be permitted at these sessions as well.

 *Weingarten* dealt with the right of representation in the context of an investigation. In that setting, the right of mutual aid is implicated because of the possibility that the representative would be able to assist an intimidated employee in responding to the employer's questions. The right of representation arises only when an employer insists on an employee's participation in an interview. "[T]he employer is free to carry on his inquiry without interviewing the employee, and thus leave to the employee the choice between having an interview unaccompanied by his representative, or having no interview and forgoing any benefits that might be derived from one." *Weingarten,* 420 U.S. at 258, 95 S.Ct. at 964. Compelled participation by the employee is thus necessary before the right to representation is implicated under *Weingarten.*

 While union representation must be permitted at some types of disciplinary sessions, it is the presence of an investigatory element which gives rise to the right. *See NLRB v. Columbia University,* 541 F.2d 922, 930–31 (2d Cir. 1976). In *United States Gypsum Co.,* 200 N.L.R.B. 305 (1972), an employee was called to his employer's office, given a misconduct report filed against him, and warned about certain company policies. During the course of the meeting, no questions were asked nor was the employee called upon to participate in any form of investigation. The employee complained that he should have been allowed his union representative when requested. The Board dismissed the unfair labor practice charge since the employee was not put in a position where he was forced to defend himself and thus there was no need for union representation. As one commentator has aptly stated:

Not all meetings, and apparently not all disciplinary interviews, are subject to representation . . .. If the meeting is disciplinary in character, but explanatory in the sense that the employee is only told what the employer intends to do and does not call upon the employee to defend himself, no representation need be provided.

Brodie, *Union Representation and the Disciplinary Interview,* 15 B.C. Indus. & Com.L. Rev. 1, 28 (1973). *See Mt. Vernon Tanker Co. v. NLRB,* 549 F.2d 571 (9th Cir. 1977) (alternate ground) (*Weingarten* does not require that representation be permitted upon request at a "logging" in which a seaman is merely informed of the consequences of his actions and no interrogation takes place.)

At the disciplinary sessions involved in this case, the employees were simply informed of the disciplinary action to be taken. At such a meeting, absent any interrogation, the protective role of union representation envisioned by *Weingarten* is not applicable. Consequently, the Board was incorrect in holding that the Company violated section 8(a)(1) by denying union representation at these proceedings.

 Apart from the violations of section 8(a)(1) arising out of the denial of employee rights under section 7 as construed by *Weingarten,* the Board held that the unilateral change in company policy regarding such representation was a refusal to bargain about a mandatory subject of bargaining and hence a violation of sections 8(a)(5) and 8(a)(1). The Company challenges this holding, arguing that the policy change was made in good faith and that the ability to have representation was not a term or condition of employment. Finding neither of these contentions persuasive, we affirm the Board's ruling on this point.

At the outset we note that the intentions of the Company, be they good or bad, are irrelevant. It is the unilateral change in a matter which is a mandatory subject of bargaining that constitutes a violation of the Act. Therefore, if bargaining was required, the Company's unilateral change in policy violated the Act.

Collective bargaining is required when the matter at issue concerns the terms or conditions of employment. However, as this court has cautioned,

> the phrase "terms and conditions of employment" is to be interpreted in a limited sense which does not include every issue that might be of interest to unions or employers. . . . A mere remote, indirect or incidental impact is not sufficient. In order for a matter to be subject to mandatory collective bargaining it must *materially* or *significantly* affect the terms or conditions of employment.

*Seattle First National Bank v. NLRB,* 444 F.2d 30, 32–33 (9th Cir. 1971) (footnote omitted; emphasis in original). Here the ability to have union representation had the requisite impact on employment. The matter directly concerned an aspect of the employer-employee relationship, *see Allied Chemical & Alkali Workers Local 1 v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 178, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971), and such representation could potentially have a substantial impact on job security and tenure. *Cf. Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 223, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964) (Stewart, J. concurring) (subjects such as product design or volume and kind of advertising have indirect and uncertain impact on job security and are not mandatory bargaining subjects, nor are management decisions fundamental to the basic direction of the enterprise mandatory subjects of bargaining). The Board committed no error in holding that the Company was required to bargain over any change in its policy concerning union representation at meetings with its employees. *Cf. NLRB v. Tomco Communications, Inc.,* 567 F.2d 871, 880 n.8 (9th Cir. 1978) (noting that the manner in which disputes are settled during the term of a collective bargaining agreement is generally a mandatory subject of bargaining).

Finally, the Company contends that the Board violated section 10(c) of the Act [11] by ordering as a part of its remedy that the suspended and discharged employees be reinstated and paid lost wages. The Company argues that the employees were disciplined for "just cause" (*i. e.,* the failure to maintain an adequate level of productivity) and that the Board was precluded from making such an order. We disagree with the Company.

It is well established that the Board possesses broad discretion in ordering remedies for violations of the Act. *Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 215–17, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), and cases cited therein. Section 10(c) limits this discretion by prohibiting "the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause." However, the Supreme Court has held that the above-quoted limitation was intended by Congress to preclude reinstatement of an individual who had been discharged for misconduct and that no limitation was intended on "the Board's power in fashioning remedies when the loss of employment stems directly from an unfair labor practice . . .." *Fibreboard Paper Products* at 217, 85 S.Ct. at 406.

Here the employees were discharged or suspended because they failed to meet the production quota. As shown, the quota systems were instituted in violation of sections 8(a)(5) and 8(a)(1). Therefore, the employees were disciplined pursuant to a program which was in itself the product of an unfair labor practice. Because the loss of employment stemmed directly from the unlawful refusal to bargain, it was well within the Board's discretion to order reinstatement with back pay.[12]

11. Section 10(c), 29 U.S.C. § 160(c), provides in relevant part:

> No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause.

12. The Company's argument that a back pay award is penal in the absence of a showing that the employees involved would not have been subsequently discharged or suspended for

Enforcement of the Board's order is granted except insofar as it holds that that employer committed an unfair labor practice by refusing to allow union representation when the employees were informed of final disciplinary action.

some other cause is without merit. Under the circumstances of this case, we will not impose such a burden (which quite likely could *never* be met) upon the Board. We will not disturb the remedy unless it is "a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Virginia Electric & Power Co. v. NLRB,* 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943). Far from being such a case, the Board's remedy here repairs the injury directly caused by the Company's violation of the Act.