600 F.2d 120
 101 L.R.R.M. (BNA) 2378, 86 Lab.Cas. P 11,327
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
POTTER ELECTRIC SIGNAL COMPANY, Respondent,
International Brotherhood of Electrical Workers, Local No.
1, AFL-CIO, Intervenor-Petitioner.
 No. 78-1763.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 17, 1979.
Decided May 21, 1979.
Rehearing and Rehearing En Banc Denied July 9, 1979.
 
 Sara McLaurin Green, Atty., N.L.R.B., Washington, D.C. (argued), John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Kenneth B. Hipp, Deputy Asst. Gen. Counsel, N.L.R.B., Washington, D.C., on brief, for petitioner, N.L.R.B.
 Davis Biggs, Jr. of Biggs, Casserly, Barnes, Fickie & Wolf, St. Louis, Mo., argued and on brief, for respondent, Potter Electric.
 Marilyn S. Teitelbaum of Schuchat, Cook & Werner, St. Louis, Mo., argued and on brief, for intervenor-petitioner, International Brotherhood.
 Before ROSS, STEPHENSON and HENLEY, Circuit Judges.
 ROSS, Circuit Judge.
 
 
 1
 This matter comes before us upon the application of the National Labor Relations Board (Board) for enforcement of its order holding that Potter Electric Signal Company (Potter) violated section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), when it discharged Sarah Pegues and Peggy Koelling (employees) after they had engaged in a fight on the production line of the plant. The Board found that Potter violated section 8(a)(1) by requiring the employees to attend investigatory interviews without the presence of their union steward after they had requested his presence and when the employees reasonably believed that disciplinary action against them might (and did) result. We uphold the determination of a section 8(a)(1) violation for the reason stated, but we modify the remedy as hereinafter set forth.
 
 
 2
 The relevant facts, based on the credibility determinations of the Administrative Law Judge (ALJ), are not seriously in dispute, and were set forth by the ALJ as follows:
 
 
 3
 On the morning of February 20, 1978, employees Sarah Pegues and Peggy Koelling were working on a tableveyor line when they got involved in an argument over their work. The argument only continued for a few minutes, but it became rather loud. Pegues told Koelling that anything she had to say to her she could say to her face, and Koelling replied that Pegues could kiss her ass. Pegues then struck or shoved Koelling with her hand. At this point, manufacturing supervisor Joseph Ronzio came on the scene and shut down the line, told the two employees to punch out, restarted the line with two replacement employees in the place of Pegues and Koelling, and told Pegues to go to the cafeteria and Koelling to stand by his desk. He then left and went to plant manager Robert Vancil's office. I credit Pegues' testimony that she asked Ronzio, immediately after she was first told to go to the cafeteria, to have shop steward Schilly accompany her to the cafeteria, and that his only reply was that she was to go to the cafeteria. I also credit Pegues' claim that she later asked Ronzio where Schilly was as she entered the cafeteria with Ronzio and Vancil, and was again told by Ronzio to go into the cafeteria and sit down.
 
 
 4
 As Ronzio left to get Vancil, Ms. Koelling shouted for shop steward Mark Schilly who worked nearby. Schilly went to Koelling, and found her crying. He got no explanation as to what had happened from her, nor did he talk to Pegues about what had happened. Ronzio and Vancil came to the scene after Schilly arrived, at a time when Pegues, Schilly, and Koelling were walking towards the cafeteria. Schilly asked Vancil what was going on, and Vancil told him to "go back to work, Mark, go back to work." Schilly returned to his work station.
 
 
 5
 Vancil and Ronzio met with Pegues in the cafeteria. Vancil asked her what had happened. She related the altercation she had had with Koelling, and Vancil told her that she was fired and she should punch out. She did and left. Koelling was then called into the cafeteria and Vancil questioned her as to what had happened. After receiving her explanation, he told her that she was suspended pending investigation. She was in fact informed by the Company's personnel manager the following day that she was discharged as a result of investigation.
 
 
 6
 I credit Schilly's testimony that after he saw Pegues and Koelling leave, he stopped Vancil and asked him what was going on, and received the reply that it did not concern Schilly. Schilly asked what it was that did not concern him, and said that he had just seen two people leave. Vancil rejoined, "It doesn't concern you."
 
 
 7
 It is clear from the evidence that the cafeteria was customarily used as the place to investigate and administer discipline, and that the employees were aware of this.
 
 
 8
 (Footnotes omitted.)
 
 
 9
 The ALJ determined that Potter had violated section 8(a)(1) by failing to allow the requested union assistance at the investigatory interviews and recommended that the Board order reinstatement and back pay for the employees. He also recommended a cease and desist order and the posting of the usual corresponding notice. The Board agreed with the ALJ but added the requirement that Potter expunge any record of the discharges from the employees' company personnel records.
 
 Potter claims that
 
 10
 I. The Board's reinstatement and back pay order is ultra vires under the National Labor Relations Act as amended because the discharges were motivated by employees' misconduct.
 
 
 11
 II. Absent a finding that any request was made by Koelling or on her behalf that a steward be present at her interview, there can be no finding that her Section 7 rights were violated.
 
 
 12
 III. The finding that Pegues requested the presence of the steward is not supported by substantial evidence on the record considered as a whole.
 
 
 13
 We find that there is substantial evidence in the record as a whole to justify the findings of the Board that Pegues requested the presence for the steward at the interview and that Koelling called for the steward, who responded to her call but was ordered back to work by the plant manager. The record as a whole justifies the determination by the Board that both employees made known their desire to have a union representative present with them at investigatory meetings which the employees could and did reasonably expect might result in their discipline. Therefore the determination of the section 8(a)(1) violation by the Board was not only supported by substantial evidence but was clearly correct. See NLRB v. J. Weingarten, Inc., 420 U.S. 251, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975); AAA Equipment Service Company v. NLRB, 598 F.2d 1142 (8th Cir. 1979) and Newton Sheet Metal, Inc. v. NLRB, 598 F.2d 478 (8th Cir. 1979).
 
 
 14
 The determination, however, that the proper remedy in this case should include reinstatement and back pay cannot be upheld. The record is clear that the employees were not discharged for requesting union assistance, especially in view of the fact that the employees did not insist upon that right and in fact participated in the interviews.[1] Neither the ALJ nor the Board specifically determined that the firing of the two employees resulted from their request for assistance, and any such determination would not have been supported by substantial evidence. Rather it is clear that the employees were discharged for a fight that resulted in shutting down the production line and that the section 8(a)(1) violation was only incidental to the investigation which preceded the firing.
 
 
 15
 Section 10(c) of the National Labor Relations Act, 29 U.S.C. § 160(c), specifically provides that "(n)o order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause." We recognize that the Board has held in several cases that in spite of this clear statutory language, the remedy is proper as the restoration of the status quo is, in the Board's opinion, the Only effective remedy for the company's violations. While realizing that in some cases the restoration of the status quo is necessary, we do not subscribe to that statement as a proper rule under these circumstances.
 
 
 16
 Both parties and the intervenor union cite Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964) concerning whether reinstatement and back pay would be appropriate in this case. In Fibreboard the company had failed to bargain with the union over a decision to subcontract portions of the work which would result in the layoff of several employees. This refusal to bargain was held to be an unfair labor practice justifying the Board's use of its remedial powers in ordering the company to reinstate its workers with back pay.
 
 
 17
 In this case, unlike Fibreboard, the employees, by their own actions, caused their own discharges by participating in a fight which stopped the production line. In Fibreboard, Chief Justice Warren, speaking for the Court, made the following statement:
 
 
 18
 It is argued, nonetheless, that the award exceeds the Board's powers under § 10(c) in that it infringes the provision that "(n)o order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause. . . ." The legislative history of that provision indicates that it was designed to preclude the Board from reinstating an individual who had been discharged because of misconduct.[11]
 
 
 19
 11. The House Report states that the provision was "intended to put an end to the belief, now widely held and certainly justified by the Board's decision, that engaging in union activities carries with it a license to loaf, wander about the plants, refuse to work, waste time, break rules, and engage in incivilities and other disorders and misconduct." H.R.Rep.No. 245, 80th Cong., 1st Sess., 42 (1947). The Conference Report notes that under § 10(c) "employees who are discharged or suspended for interfering with other employees at work, whether or not in order to transact union business, or for engaging in activities, whether or not union activities, contrary to shop rules, or for Communist activities, or for other cause (interfering with war production) . . . will not be entitled to reinstatement." H.R.Conf.Rep.No. 510, 80th Cong., 1st Sess., 55 (1947).
 
 
 20
 Id. at 217, 85 S.Ct. at 406.
 
 
 21
 In International Ladies' Garment Workers' Union v. Quality Mfg. Co., 420 U.S. 276, 95 S.Ct. 972, 43 L.Ed.2d 189 (1975), the Supreme Court upheld an award of reinstatement and back pay, but only upon a determination that the employees who were fired, a chairlady of the union and an employee who refused to attend an investigatory meeting without the chairlady's presence, were fired for properly insisting upon their rights under section 7 of the Act.
 
 
 22
 The Board and the intervenor cited Alfred M. Lewis, Inc. v. NLRB, 587 F.2d 403 (9th Cir. 1978) for the proposition that reinstatement with back pay is a proper award in this case. However, we note that in that case, after reciting Chief Justice Warren's statement concerning the right to discharge for misconduct, the Ninth Circuit distinguished their case from another decision involving a misconduct discharge. The court in Alfred M. Lewis specifically found that "the employees were disciplined pursuant to a program which was In itself the product of an unfair labor practice." Id. at 412 (emphasis added).
 
 
 23
 While the Board has broad authority to restore the status quo and make whole any losses suffered by the employees because of unfair labor practices, Hinson v. NLRB, 428 F.2d 133, 136 (8th Cir. 1970), it does not have the power to order reinstatement or back pay for employees discharged for obvious personal misconduct, because to do so would violate section 10(c) as interpreted by the Supreme Court in Fibreboard.
 
 
 24
 Enforcement is granted as to section 1 and sections 2(c) and 2(d) of the ALJ's proposed order as adopted by the Board. Enforcement is denied as to sections 2(a) and 2(b). The notice shall be modified by striking the last paragraph thereof.
 
 
 
 [1]
 In this regard contrast this case to AAA Equipment Service Company v. NLRB, 598 F.2d 1142 (8th Cir. 1979) and Newton Sheet Metal, Inc. v. NLRB, 598 F.2d 478 (8th Cir. 1979). In both of these companion cases, the employees were fired for refusing to participate in discussions with their employers without union representation