**GOLDEN DAY SCHOOLS, INC.,**
**Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 78–2518.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 10, 1979.

Decided May 8, 1981.

John W. Prager, Jr., Musick, Peeler & Garrett, Newport Beach, Cal., for petitioner.

Christopher Katzenbach, NLRB, Washington, D. C., for respondent.

Before BROWNING, Chief Judge, CHOY, Circuit Judge, and THOMPSON,* District Judge.

* Honorable Bruce R. Thompson, Senior Judge, United States District Court for the District of Nevada, sitting by designation.

BROWNING, Chief Judge:

Employees of Golden Day Schools, Inc., a proprietary child care facility, held meetings at which the benefits of unionization were discussed. At least thirteen participants were interrogated about the meetings, and eight were fired. Employees picketed Golden Day and distributed leaflets. Five additional employees were discharged.

The union filed an unfair labor practice charge. The Board found Golden Day had violated section 8(a)(1) of the National Labor Relations Act by coercively interrogating employees concerning their interest in the union and asking one employee to renounce her membership.[1] The Board also found Golden Day had violated sections 8(a)(1) and (3) of the Act by discharging the 13 employees for union activity, and ordered reinstatement with back pay.

I.

■ Golden Day argues the Board should have exercised its discretion not to assert jurisdiction over Golden Day because Golden Day operates as an "adjunct" to the California school system, performing services "intimately connected" with the purposes of the school system, within the meaning of prior Board decisions declining to exercise jurisdiction over private employers standing in such a relationship to an exempt state entity.[2]

The cases relied upon by Golden Day are no longer controlling. Under subsequent Board decisions the test is "whether th[e] employer has sufficient control over the employment conditions of its employees to enable it to bargain with a labor organization which represents them." *D. T. Watson Home for Crippled Children*, 242 NLRB, ——, —— (1979) (No. 187).[3]

Although the State of California reviews Golden Day's budget and sets academic standards, Golden Day, not the State, controls such matters as hiring, firing, employee evaluation, pay raises, grievance procedures, and sick and vacation allowances. Clearly, Golden Day has sufficient control over the terms and conditions of employment of its employees to bargain effectively with a union representing their interests.

■ Alternatively, Golden Day contends that its gross income was below the $1,000,000 standard established by the Board for exercising jurisdiction over "educational institutions." However, Golden Day met the Board's $250,000 standard for exercising jurisdiction over "day-care centers," and the Board concluded that Golden Day fell in this category.

Golden Day does not challenge the appropriateness of the two standards; it argues only that the Board applied the wrong standard to Golden Day because the Board mischaracterized Golden Day's operations. The issue is the reasonableness of the Board's classification on the facts.

■ The Board's determination of such a question will not be set aside "in the absence of extraordinary circumstances, such as unjust discrimination." *NLRB v. Car-*

---

1. *Golden Day does not challenge this aspect of the Board's findings and conclusions.*

2. *Laurel Haven School for Exceptional Children, Inc.*, 230 NLRB 1197, 1198–99 (1977); *Perkins School for the Blind*, 225 NLRB 1293, 1294 (1976); *Mitchell School, Inc.*, 224 NLRB 1017 (1976); *Rural Fire Protection Company*, 216 NLRB 584 (1975); *Pennsylvania School for the Deaf*, 213 NLRB 513 (1974); *Overbrook School for the Blind*, 213 NLRB 511 (1974). Golden Day relies heavily upon *Pennsylvania Labor Relations Board*, 209 NLRB 152 (1974). This case applied the "adjunct" test disapproved in *D. T. Watson Home for Crippled Children*, cited in the text.

We do not understand Golden Day to claim statutory exemption as a "political subdivision" of the state, *see* 29 U.S.C. § 152(2). In any event, it is clear that Golden Day is not a "political subdivision" of the state under the test traditionally applied under Section 152(2). And the most liberal version of the statutory test is the same as the test for "adjunct" status applied in this opinion. *See NLRB v. Austin Development Center, Inc.*, 606 F.2d 785, 789 (7th Cir. 1979).

3. *See also National Transportation Service, Inc.*, 240 NLRB 565 (1979).

*roll-Naslund Disposal, Inc.*, 359 F.2d 779, 780 (9th Cir. 1966).[4] There are no such circumstances here. The administrative law judge concluded that Golden Day's operations are "essentially undistinguishable from *Young World*[5] and *Salt & Pepper Nursery School*,"[6] in which the Board asserted jurisdiction under the standard for "day-care centers". We agree. Golden Day enrolls children between 2 years and 4 years 9 months in age.[7] Its hours of operation (6:30 a. m. to 6 p. m.) coincide with the parents' work day rather than with a conventional school schedule. Most of its employees are non-teaching aides. Although some of Golden Day's activities are educational, the emphasis, as the administrative law judge stated, is upon "caring for, rather than educating, very young children." Educational elements in its program are informal and occupy a small part of the daily schedule. Most of the day is spent feeding the children, assisting them during bathroom periods, putting them down for naps, and supervising them in coloring, painting, or singing, indoor play with toys, or outside playground activities.

## II.

█ Golden Day argues that the evidence was not sufficient to sustain the Board's finding that the employees were discharged because of their efforts to organize a union.

The employees met on September 30, 1976 and October 7. Golden Day learned of the meetings on Monday, October 11. On the same day, management personnel began to question individual employees regarding the meetings. Witnesses credited by the Administrative Law Judge testified that the interrogation concerned formation of a union. On Wednesday management personnel called a meeting of all employees and told them there would be no union at Golden Day. From Monday through Friday, thirteen employees were interrogated, one for three hours, several more than once. Eight of the thirteen interrogated employees were discharged during the course of the week. On the following Monday, numerous employees picketed and distributed leaflets at Golden Day. Five were discharged. Thirteen of Golden Day's total workforce of 25 to 30 were terminated during the eight-day period.

Golden Day's management testified that seven of the first eight employees terminated were not discharged because they met to consider organizing a union but because they participated in unauthorized meetings with parents to induce these parents to withdraw their children from Golden Day and enroll them in a new school to be formed by staff members; because the employees made false and malicious statements to these parents regarding Golden Day's services and facilities; and because the employees falsely denied attending the meetings or making the derogatory statements to the parents. Golden Day asserts the remaining one of the first eight employees terminated was discharged for unsatisfactory work performance.[8]

Management testified that three of the last five employees terminated were not discharged because they picketed Golden Day, but because they circulated a disparaging leaflet regarding Golden Day while

4. *See also NLRB v. Timberland Packing Corp.*, 550 F.2d 500, 501 (9th Cir. 1977).

5. 216 NLRB 520 (1975).

6. 222 NLRB 1295 (1976). *See also Austin Development Center, Inc.*, 226 NLRB 134 (1976); *Lutheran Welfare Services of Illinois*, 216 NLRB 518 (1975).

7. Golden Day also provides "limited day-care and enrichment care for approximately 50 children age 4 years 9 months to age 12." This fact is not relevant to the jurisdictional issue since Golden Day concedes that the primary service is day-care until the children's parents arrive to pick them up.

8. This employee, Henry, attended the union meetings and was discharged with the others who attended them. She was given neither written nor oral warning that her work was unsatisfactory. There was no evidence that she was late to work or fell asleep on the job, as Golden Day asserted.

picketing, and that the remaining two were not discharged.[9]

"[I]t is particularly within the purview of the Board to determine in cases such as this on conflicting evidence what the motivation for discharge was." *NLRB v. Winkel Motors, Inc.*, 443 F.2d 38, 40 (9th Cir. 1971). The determination may, and usually must, be based upon circumstantial evidence.[10] Self-serving declarations by Golden Day's management personnel regarding their motivation are not conclusive.[11] Indeed, when the Board determines, as it did here, that such declarations are untrue, the false assertions of lawful purpose support the inference that the declarants' motive was unlawful.[12]

The record amply supports the Board's finding that the discharges were motivated by antiunion bias. The discharges followed immediately upon union organizing activity in which the discharged employees participated. Golden Day evidenced strong antiunion bias by announcing to its assembled workers that there would be no union, and by the timing, nature, and extent of interrogation of individual employees. And as the Administrative Law Judge found, Golden Day "concocted the flimsiest of explanations" for its conduct.

Golden Day questioned the adequacy of the performance of only one of the discharged employees, and as to this employee the charge was not borne out by the record.[13] There was no evidence that meetings between staff and parents were prohibited unless specifically authorized. There was no evidence that the two meetings that were held had any purpose except to consider organization of a union. There were no parents at the first meeting; only two parents attended the second. One was invited because of her knowledge of union matters; the other attended to inquire about conditions at Golden Day. The unfavorable statements regarding Golden Day's services and facilities appear from the testimony to have been moderate responses to direct questions asked of employees by this parent. There is no evidence that any employee sought to solicit these or any other parents to remove their children from Golden Day.

Since the leaflet containing statements disparaging Golden Day was distributed during the picketing, it could not have played a part in the eight discharges that occurred before the picketing. The record also supports the inference that the disparaging statements did not influence the discharge of the five employees who picketed while the leaflet was being distributed.

Golden Day admits that two of these five employees did not participate in distributing the leaflet.[14] The Administrative Law Judge found that Golden Day punished all "five employees on no known basis other than having picketed the school following [the] rash of discharges," indicating that the ALJ discredited testimony of the President of Golden Day that he was aware of the contents of the leaflet when he discharged the other three of the five employees. Rejection of the alternative motive is also reflected in the ALJ's finding that all five employees were discharged "for engaging in the protected activity of protesting an unfair labor practice." From what we have said earlier, it is evident that this finding that anti-union bias alone motivat-

---

**9.** Two bus drivers who engaged in the picketing were "relieved of their keys." Golden Day argues this was done only to permit others to drive the vehicles. However, there was evidence that the drivers picketed only when not on duty, that when relieved of their keys they were told to pick up their pay checks, that upon inquiry, one of the two was told he had been fired, that neither was told of Golden Day's limited purpose in taking the keys, and that they were asked to return to work three days later when Golden Day found itself "in need of replacements for those individuals."

**10.** *See Shattuck Denn Mining Corp. v. NLRB*, 362 F.2d 466, 470 (9th Cir. 1966).

**11.** *Id.*

**12.** *See id.; Folkins v. NLRB*, 500 F.2d 52, 53 (9th Cir. 1974).

**13.** *See* note 8.

**14.** *See* note 27.

ed the discharge of all five employees is amply supported by the record.[15] Assuming distribution of the leaflet would have afforded Golden Day justifiable ground for discharge of three of these employees, therefore, their discharges are nonetheless unlawful, for it is settled that "[d]ischarge of an employee for whom the employer has a justifiable ground for discharge constitutes a violation of § 8(a)(3) if the employer's motivation is in fact discriminatory." *NLRB v. Western Clinical Laboratory, Inc.,* 571 F.2d 457, 459 (9th Cir. 1978).

### III.

■ Golden Day contends that even if the employees were dismissed for union activity, the Board abused its discretion in ordering that they be reinstated with back pay. Golden Day argues that reinstatement was inappropriate because (1) the employees' pre-termination misconduct in meeting with parents without prior authorization "constituted gross disloyalty, justifying a denial of their reinstatement," and (2) the employees' post-termination misconduct in distributing a leaflet impugning

Golden Day's services and facilities "renders them unfit for further service."

Both arguments relate only to the appropriateness of the remedy. We have sustained the Board's finding that the employees were not discharged for their alleged misconduct, but because of their union activity. For the purpose of this portion of their argument, Golden Day assumes the correctness of this decision. Thus, the issue here is not whether the employees might have been discharged for the alleged misconduct, but whether that misconduct bars reinstatement with back pay.[16] For this reason, the portion of Section 10(c) of the Act that bars reinstatement of any individual discharged for cause,[17] and cases such as *NLRB v. Electrical Workers,* 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 (1953), applying this provision, are not strictly relevant. As the court said in *Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 217, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1965):

> The legislative history of that provision indicates that it was designed to preclude the Board from reinstating an individual

---

**15.** For this reason "mixed motive" cases, applying the "moving cause" test to discharges motivated by both lawful and unlawful purposes, are not relevant. *See, e. g., L'Eggs Products, Inc. v. NLRB,* 619 F.2d 1337, 1341–42 (9th Cir. 1980) (collecting cases).

**16.** *See NLRB v. Yazoo Valley Electric Power Ass'n,* 405 F.2d 479, 480 (5th Cir. 1968); *NLRB v. Apico Inns of California, Inc.,* 512 F.2d 1171, 1175 (9th Cir. 1975); *NLRB v. O'Daniel Oldsmobile, Inc.,* 179 NLRB 398, 404–05 (1969).

The inquiry has also been stated in terms of the coverage of the statute—whether the employees' conduct was "protected" activity under the Act—rather than in terms of selecting the appropriate remedy. Under this analysis "[t]he standard is whether [the employee's] improper conduct was so indefensible as to forfeit the Act's protection." *NLRB v. Max Factor & Co.,* 640 F.2d 197, 89 CCH Lab. Cas. ¶ 12,232 (9th Cir. 1980). *See also NLRB v. Washington Aluminum Co.,* 370 U.S. 9, 17, 82 S.Ct. 1099, 1104, 8 L.Ed.2d 298 (1962); *Coors Container Co. v. NLRB,* 628 F.2d 1283, 1286 (10th Cir. 1980); *Dreis & Krump Mfg. Co. v. NLRB,* 544 F.2d 320, 328–29 (7th Cir. 1976); *NLRB v. Cement Transport, Inc.,* 490 F.2d 1024, 1029–30 (6th Cir. 1974); *NLRB v. Owners Maintenance Corp.,* 581 F.2d 44, 49–50 (2d Cir. 1978). This analysis may obscure a consideration that is

important in some cases: The purpose of the remedy is not merely to vindicate or punish a particular employer or employee, but to protect the public interest. *See Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 192–93, 194, 61 S.Ct. 845, 851, 852, 85 L.Ed. 1271 (1941); *Trinity Valley Iron & Steel Co. v. NLRB,* 410 F.2d 1161, 1168 (5th Cir. 1969). Even though in the circumstances of a particular case, the unlawful conduct of the employees may make the remedy of reinstatement inappropriate, other remedies may be available and should be employed to protect the public interest in deterring unfair labor practices.

**17.** Section 10(c), 29 U.S.C. § 160(c), provides in part that if the Board finds that any person has engaged in an unfair labor practice, the Board shall issue "an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this [Act]." The portion of the section referred to in text then provides, however, that "[n]o order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause."

who had been discharged because of misconduct. There is no indication, however, that it was designed to curtail the Board's power in fashioning remedies when the loss of employment stems directly from an unfair labor practice as in the case at hand. (footnote omitted) [18]

■ Golden Day recognizes that the Board has broad discretion in the choice of remedies,[19] and that reinstatement with back pay is the normal remedy for an unlawful termination.[20] The question the Board must answer in each case is whether in the particular circumstances reinstatement "will effectuate the policies" of the Act.[21] The Board's exercise of its broad discretion to determine when reinstatement is appropriate is subject to only "limited judicial review." *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964), *quoted in NLRB v. Western Clinical Laboratory, Inc.*, 571 F.2d 457, 461 (9th Cir. 1978). As the Supreme Court said in *NLRB v. Seven-Up Bottling Co.*, 344 U.S. 344, 346–47, 73 S.Ct. 287, 288–89, 97 L.Ed.2d 377 (1953) "[w]hen the Board, 'in the exercise of its informed discretion,' makes an order of restoration by way of back pay, the order 'should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.'"[22]

Important policies served by the Act include "[a]voidance of labor strife, prevention of a deterrent effect on the exercise of rights guaranteed employees by § 7 of the Act, 29 U.S.C. § 157, and protection for the victimized employee." *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 185, 94 S.Ct. 414, 425, 38 L.Ed.2d 388 (1973). "The primary purpose of the Act is to protect the public interest and the policies of the Act by mitigating the effects of the violation and preventing future violations," *Marriott Corp. v. NLRB*, 491 F.2d 367, 371 (9th Cir. 1974).[23]

■ In determining whether reinstatement will serve these policies, the Board must consider the degree and kind of unlawful conduct committed by the employer and by the employees, the relationship between the conduct of both, and the probable impact, in all the circumstances, of selecting the particular remedy. "[T]he Board, as a part of the process of determining whether reinstatement would effectuate the policies of the Act, will balance the severity of the employer's unfair labor practice which provoked the industrial disturbance against whatever employee misconduct may have occurred in the course of the strike." *NLRB v. Thayer Co.*, 213 F.2d 748, 755 (1st Cir. 1954).[24]

The appropriateness of reinstatement as a remedy for the discharge of the eight employees because of their attendance at union organizing meetings requires little discussion.

18. *See Alfred M. Lewis, Inc. v. NLRB*, 587 F.2d 403, 412 (9th Cir. 1978).

19. *See Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 181, 94 S.Ct. 414, 423, 38 L.Ed.2d 388 (1973); *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 215–18, 85 S.Ct. 398, 405–07, 13 L.Ed.2d 233 (1964); *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 194–96, 61 S.Ct. 845, 852–53, 85 L.Ed. 1271 (1941).

20. *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 187–89, 61 S.Ct. 845, 849–50, 85 L.Ed. 1271 (1941); *NLRB v. Apico Inns of California, Inc.*, 512 F.2d 1171, 1175 (9th Cir. 1975).

21. *See* note 17.

22. *See NLRB v. Western Clinical Laboratory, Inc.*, 571 F.2d 457, 460 (9th Cir. 1978); *United*

*Association of Journeymen, et al. v. NLRB*, 553 F.2d 1202, 1205 (9th Cir. 1977).

23. *See also NLRB v. J. H. Rutter-Rex Mfg. Co.*, 396 U.S. 258, 263, 90 S.Ct. 417, 420, 24 L.Ed.2d 405 (1969); *Social Security Bd. v. Neirotko*, 327 U.S. 358, 363 & n.11, 66 S.Ct. 637, 640 & n.11, 90 L.Ed. 718 (1946); *Phelps Dodge Co. v. NLRB*, 313 U.S. 177, 193–94, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941).

24. As we have said:
   . . . the misconduct which will justify a court in refusing to enforce a Board order to rehire depends upon the degree and kind of the misconduct and each case must be decided on an ad hoc basis.
   *NLRB v. Miller Redwood Co.*, 407 F.2d 1366, 1370 n.2 (9th Cir. 1969).

Protection of the right of self-organization lies at the heart of the Act. Golden Day's reaction was accurately characterized by the administrative law judge as a "harsh and sudden crackdown," beginning with coercive interrogations and ending with discharge. As has been seen, the employees' alleged misconduct—meeting with parents without prior authority and responding to questions regarding conditions at Golden Day—was, at worst, innocuous. As the Board found, Golden Day's "stated reasons for the first eight discharges were transparently pretextual."

In sum, the employer's violations were egregious; and the employees' conduct was not of the quality or extent that might reasonably be thought to threaten future amicable relations between the employer and the employees.[25] In these circumstances reinstatement was clearly necessary to vindicate the purposes of the Act, deter future violations, and preserve industrial peace.[26]

Golden Day contends that three of the remaining five discharged employees should not be reinstated because they distributed a leaflet disparaging Golden Day's services and facilities while picketing Golden Day.[27] The leaflet was written in harsh language and made serious charges, not all of them true. It cannot be condoned. Nonetheless, we cannot hold that the Board abused its discretion in deciding that on balance, the purpose of the Act would best be served by reinstating the three offending employees.

Two other communications—a short written statement and a press release—were distributed with the disparaging leaflet and dealt almost exclusively with matters directly involved in the dispute. Although the leaflet itself consisted largely of criticism of Golden Day's facilities and services, these were not entirely irrelevant to the on-going dispute. Complaints about cleanliness, teachers' duties, and care of the children could be expected to figure prominently in discussions between the school's management and any union representing the employees. The leaflet ended with a plea for the parents' sympathy in the workers' dispute with Golden Day. Moreover, as the administrative law judge noted, the leaflet fell "woefully short of the malicious tone" that would have been necessary to justify discharge under the doctrine of *NLRB v. Electrical Workers*, 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 (1954). The administrative law judge concluded that, on balance, "no sufficient showing of unfitness for further duty at the school is shown for any person involved in the preparation or dissemination of the flyer."

The leaflet and other documents were prepared and distributed in response to the most severe provocation. They appeared immediately after Golden Day had coercively interrogated and peremptorily discharged eight of its employees—one-third of the work force—for union activity. The picketing during which the leaflets were distributed was primarily in protest against the unlawful and unwarranted firing of fellow employees. As the Board concluded, Golden Day "acted with flagrant

---

**25.** Reinstatement might be questionable if, for example, the misconduct has been such as to indicate that "the employee was and is unfit for the job," *NLRB v. Apico Inns, Inc.,* 512 F.2d 1171, 1176 (9th Cir. 1975); or that renewal of the employment relationship "bids ill for all concerned," *NLRB v. Yazoo Valley Electric Power Ass'n,* 405 F.2d 479, 480 (5th Cir. 1968); or that there was a "basic antagonism" between the employee and employer "that would preclude future harmonious relations between them." *NLRB v. National Furniture Mfg. Co.,* 315 F.2d 280, 286–87 (7th Cir. 1963). *Compare NLRB v. Max Factor and Co.,* 640 F.2d 197, 205, 89 CCH Lab. Cas. ¶ 12,232 (9th Cir. 1980); *NLRB v. Miller Redwood Co.,* 407 F.2d 1366,

1370 n.2 (9th Cir. 1969) (collecting cases); *NLRB v. A. P. W. Prods. Co.,* 316 F.2d 899, 904 (2d Cir. 1963).

**26.** See cases cited note 19.

**27.** Golden Day has not contended that the other two of the five employees who were discharged after they participated in the picketing had also participated in distributing leaflets. Indeed, Golden Day argued these two employees were not discharged at all and were asked to return to work when the President of Golden Day learned that, although they had engaged in picketing, they had not been seen distributing leaflets.

disregard for its employees' rights under the Act." The purposes of the Act would not be accomplished without a firm and sure sanction for such aggressive anti-union efforts. A mere finding of unlawful discharge without the added remedy of reinstatement would be a weak deterrent indeed. As Judge Sobeloff said in *NLRB v. M & B Headwear Co.*, 349 F.2d 170, 174 (4th Cir. 1965):

> An employer cannot provoke an employee to the point where she commits such an indiscretion as is shown here and then rely on this to terminate her employment. The more extreme an employer's wrongful provocation the greater would be the employee's justified sense of indignation and the more likely its excessive expression. To accept the argument addressed to us by the company would be to provide employers a method of immunizing themselves from the only real sanction against violations of section 8(a)(3). Reinstatement in the instant case is not, as the employer puts it, a reward to the employee for insurgency. Rather, as we see it, refusal to reinstate her would put a premium on the employer's misconduct. (citation omitted).[28]

The Board's order will be enforced.

---

**28.** *See also Local 833, U. A. W., AFL–CIO v. NLRB*, 300 F.2d 699, 702–03 (D.C.Cir.1962); *Oneita Knitting Mills, Inc. v. NLRB*, 375 F.2d 385, 390 (4th Cir. 1967).