**SIERRA PUBLISHING COMPANY d/b/a The Sacramento Union, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

Nos. 88–7522, 89–70037.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 5, 1989.

Decided Nov. 3, 1989.

**213**

Mark H. Van Brussel, Sacramento, Cal., for petitioner.

David A. Seid, Washington, D.C., for respondent.

Before SKOPIL, FLETCHER and FERNANDEZ, Circuit Judges.

FLETCHER, Circuit Judge:

The Sierra Publishing Company d/b/a The Sacramento Union ("the Company") petitions for reversal of a National Labor Relations Board Decision and Order holding that the Company violated § 8(a)(1) of the National Labor Relations Act when it discharged four employees for engaging in activity that the Board found protected by § 7 of the Act. The Board cross petitions for enforcement. The Company argues that the activity involved worker disloyalty and was unprotected, and that the Board's decision to the contrary is not supported by substantial evidence. We enforce the order.[1]

1. The Order is reported at 291 NLRB No. 83.

FACTS

The Company publishes a daily newspaper, *The Sacramento Union*, in Sacramento, California. It competes with the other Sacramento daily, *The Sacramento Bee*. *The Bee* enjoys greater circulation, and its superior position appears to be widely known.

Northern California Newspaper Guild, Local 52, AFL–CIO ("the Guild") represents the Company's non-supervisory employees working in the editorial, display advertising, classified advertising, commercial sales, circulation, business office, switchboard, and maintenance departments. The Company and the Guild have had a collective bargaining relationship for more than 40 years.

The collective bargaining agreement between the parties was to expire in May 1985, but the parties agreed to extend it for an additional year because of the Company's financial difficulties. The employees in the Guild unit subsequently agreed to forego a wage increase even though one was contemplated in the extended agreement, again because of the paper's financial condition. During 1986, the employees accepted a continuation of the wage cut.

In March 1986, anticipating the expiration of the extended agreement, the parties commenced bargaining. This bargaining process failed to produce a replacement contract, but instead yielded unilateral changes by the company and charges of unfair labor practices against the company based on the unilateral changes. Those charges are the subject matter of a separate appeal. In July, the Guild's membership authorized the bargaining committee to call a strike if necessary. In early August, the Company implemented the changes, which included a wage cut.

In August, a local weekly, the *Business Journal*, published an editorial lamenting the state of *The Sacramento Union*, criticizing the Company's management, and speculating about rumors of the paper's "impending demise."

The parties continued to meet to try to reach an agreement, but remained apart on many issues. The Guild bargaining committee included four Company employees; Robert Saucerman, Ana Sandoval, Georgia Canfield, and Sue Harper.[2] They were displeased with what they perceived as the Company's stalling, and in early September, they drafted and revised a letter to the Company's advertisers in hopes of getting the advertisers involved. Bargaining resumed in mid-September, and the letter was not sent. On October 1, however, the committee mailed the letter to 50 of the paper's main retail advertisers. The letter was printed on Guild letterhead, and read in full as follows:

October 1, 1987

### A ONE NEWSPAPER TOWN ... IT'S BAD FOR YOU

Who wants a one-newspaper town? The readers don't. The politicians don't. As a business person and advertiser, you don't.

And we, the employees of The Sacramento Union, don't. Perhaps only the Bee would like it.

For nearly a year and a half we have been trying to get a fair contract with the Sacramento Union. We're not asking for more money. In fact, we expect to continue living with a pay cut—but not the 15% to 20% cut that was imposed on us a year ago.

During these trying times of bargaining, the paper's circulation has plummeted, good employees have left for better jobs, advertising has suffered. The newspaper as a whole is speeding downhill.

We, the employees, would like to get the newspaper back on track. We want to use our energies and our loyalty to help The Union struggle back onto its feet. Instead, we find ourselves fighting the out-of-town owner's edicts.

Jack Bates, the general manager of The Union, says he wants a fair agreement, but his words and his actions don't mesh. We urge you to contact Jack (442–7811 or 440–0401) and express your concern for the paper's health.

If something positive doesn't happen soon, we may all be facing the death of The Sacramento Union.

We think we can turn the paper around, but it is time for you, as a member of the community to lend a hand. Talk it over with Jack Bates, or with Bruce Winters, the editor of the Union (442–7811).

Your call can help us save the second newspaper voice in Sacramento.

SACRAMENTO UNION EMPLOYEES NEGOTIATING COMMITTEE

Bob Saucerman

Ana Sandoval

Georgia Canfield

Sue Harper

We'd welcome a call too. Ask for any of us at 442–7811.

On October 7, the newspaper's president and general manager, John Bates, met with Saucerman, Sandoval, Canfield, and Harper and placed them on suspension pending an investigation. On October 15, Bates sent each of the four employees a letter notifying them they had been discharged. In the discharge letters, Bates accused the employees of disloyalty and complained that the October 1 letter contained half-truths, exaggerations and blatant misrepresentations which disparaged the paper and disrupted its relationship with advertisers.

In a thorough opinion, the ALJ found that the employees' act of sending the letter to the advertisers was protected concerted activity under § 7 of the National Labor Relations Act and, that consequently, the Company had violated § 8(a)(1) of the Act by suspending and discharging

---

**2.** Saucerman worked as a retail advertising salesperson and was responsible for many of *The Union*'s major accounts. He had worked for the paper for nine years. Sandoval was a copy editor and food columnist and had been with the paper for six years. Canfield, a classified advertising salesperson, had worked at the paper for six years. Harper, whose job was not made a matter of record, had worked at the paper for 22 years.

them.[3] The Board adopted the ALJ's findings and order with only two modifications as to the remedy.

## STANDARD OF REVIEW

 This court will enforce an NLRB order if the Board correctly applied the law and if its factual findings are supported by substantial evidence in the record as a whole. *NLRB v. Island Film Processing Co., Inc.*, 784 F.2d 1446, 1450 (9th Cir. 1986), *Whisper Soft Mills, Inc. v. NLRB*, 754 F.2d 1381, 1384–85 (9th Cir.1985). The courts of appeals give deference to the Board's reasonable interpretations and applications of the National Labor Relations Act. *NLRB v. Howard Electric Co.*, 873 F.2d 1287, 1290 (9th Cir.1989). Specifically in this case, the Board has the task of delineating the precise boundaries of § 7's mutual aid or protection clause. *Eastex, Inc. v. NLRB*, 437 U.S. 556, 568, 98 S.Ct. 2505, 2513, 57 L.Ed.2d 428 (1978).

 While the substantial evidence standard of review is relatively deferential to the agency as factfinder, review must still be searching and careful. *Containerfreight Corp. v. United States*, 752 F.2d 419 (9th Cir.1985). However, if the findings are supported by substantial evidence, they must be upheld even if the court might reach a different conclusion based on the same evidence. *NLRB v. Nevis Industries*, 647 F.2d 905, 908 (9th Cir.1981).

## DISCUSSION

I. Development of the Scope of § 7 Protection.

 An employer violates § 8(a)(1) of the NLRA by discharging or disciplining employees for exercising their § 7 right to engage in "concerted activities for the purpose of collective bargaining or other mutual aid or protection." Not all "concerted activity" is protected, however. If the employees' actions cross the lines of acceptability so that they can be characterized as "disloyal" to the employer, they lose that protection. We examine whether § 7 protection extends to the October 1 letter in light of the Supreme Court's decision in *National Labor Relations Bd. v. Local Union No. 1229 (Jefferson Standard)*, 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 (1953) and the subsequent decisions applying and further refining the disloyalty doctrine articulated in that opinion.

In *Jefferson Standard*, the union employees had an ongoing labor dispute with the employer television station. One of the tactics the employees used was to distribute to the general public a handbill which was sharply critical of the quality of the station's programming, but made no mention of a labor dispute or union authorship.[4] The employees were fired. The Supreme Court upheld the NLRB decision that the discharges did not violate § 8(a)(1) because Congress did not intend § 7 to "weaken the underlying contractual bonds and loyalties of employer and employee" *Id.* at 473, 74

**3.** Section 7. Right of employees as to organization, collective bargaining, etc.

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection....
Section 8. Unfair labor practices.
(a) It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title....
29 U.S.C. §§ 157, 158(a)(1).

**4.** The handbill read: IS CHARLOTTE A SECOND–CLASS CITY? You might think so from the kind of Television programs being presented

by the Jefferson Standard Broadcasting Co. over WBTV. Have you seen one of their television programs lately? Did you know that all the programs presented over WBTV are on film and may be from one day to five years old. There are no local programs presented by WBTV. You cannot receive the local baseball games, football games or other local events because WBTV does not have the proper equipment to make these pickups. Cities like New York, Boston, Philadelphia, Washington receive such programs nightly. Why doesn't the Jefferson Standard Broadcasting Company purchase the needed equipment to bring you the same type of programs enjoyed by other leading American cities? Could it be that they consider Charlotte a second-class community and only entitled to the pictures now being presented to them? WBT TECHNICIANS

S.Ct. at 177, and "[t]he legal principle that insubordination, disobedience or disloyalty is adequate cause for discharge is plain enough." *Id.* at 475, 74 S.Ct. at 178.

The Court's analysis emphasized that the handbill made no reference to the labor dispute.

> Their attack related itself to no labor practice of the company. It made no reference to wages, hours or working conditions.... The attack asked for no public sympathy or support.... In contrast to their claims on the picket line as to the labor controversy, their handbill of August 24 omitted all reference to it. The handbill diverted attention from the labor controversy.... The only connection between the handbill and the labor controversy was an ultimate and undisclosed purpose or motive on the part of some of the sponsors that, by the hoped-for financial pressure, the attack might extract from the company some future concession. A disclosure of that motive might have lost more public support for the employees than it would have gained, for it would have given the handbill more the character of coercion than of collective bargaining. *Id.* at 476–477, 74 S.Ct. at 178–179.

The logic of the "disloyalty" test has been criticized,[5] and its reach remains unclear.[6] As labor law commentators note, in cases decided since *Jefferson Standard*, the NLRB has progressively narrowed the areas of activity found to be unprotected because of disloyalty.[7]

■ It is settled that employees do not necessarily lose their § 7 protection simply because they "seek to improve terms and conditions of employment or otherwise improve their lot as employees through chan-

nels outside the immediate employee-employer relationship." *Eastex, Inc. v. NLRB*, 437 U.S. 556, 565, 98 S.Ct. 2505, 2512, 57 L.Ed.2d 428 (1978). Nonetheless, such third party appeals will lose protection if they are found to be disloyal.

■ *Jefferson Standard* has been read to hold that if the appeal "disparages" the employer's product, as opposed to criticizing the employer's labor practices, it is so disloyal as to lose § 7 protection. *Patterson Sargent*, 115 NLRB 1627 (No. 255) (1956).[8] However, later cases confined the reach of this exclusion, and made clear that *Jefferson Standard* was not to be read to equate criticism with disloyal product disparagement. Instead, appeals to third parties forfeit § 7 protection only if their connection to the employees' working conditions is too attenuated or if they are unrelated to any grievance which the workers may have. *See, e.g., Allied Aviation Service Co. of New Jersey, Inc.*, 248 NLRB 229, *enforced mem.*, 636 F.2d 1210 (3rd Cir.1980) (aircraft mechanic's letter to employer's customers, commercial airlines, informing them of lax safety practice was protected; "great care must be taken to distinguish between disparagement and the airing of what may be highly sensitive issues"); *Community Hospital of Roanoke Valley, Inc. v. NLRB*, 538 F.2d 607 (4th Cir.1976) (nurses' statements in television interview linking problems in patient care to labor dispute over salary were protected because they were true, were related to the labor dispute, and were not intended to alienate the public); *Emarco, Inc.*, 284 NLRB 91 (1987) (employees' remarks to general contractor that employer subcontractor never paid its bills, was "no damn

5. Justices Frankfurter, Black, and Douglas argued in dissent that concepts such as "indefensible" and "disloyal" are vague and in any event are improper legal standards in the context of a labor dispute.

6. The shifting boundaries of protection may be explained by the Board's and courts' variable reliance on different of the several factors mentioned in dicta in the *Jefferson Standard* opinion, as well as changing norms regarding what constitutes loyal worker behavior.

7. *See,* R. Gorman *Basic Text in Labor Law* 314–317 (1976) and C. Morris, *The Developing Labor Law* 160–164 (2d Ed.1983).

8. In a 3–2 split decision soon after *Jefferson Standard,* the NLRB held that distribution to the general public by striking paint-company employees of circulars giving notice of the strike and warning that paint produced by temporary strike replacements might be of inferior quality was unprotected product disparagement.

good," and could not finish the job was not disparaging because they were "related to" the labor dispute and were not "so disloyal, reckless, or maliciously untrue as to lose the Act's protection."); *Richboro Community Mental Health*, 242 NLRB 1267 (1979) (employee drug counselor's letter to state and federal funding agencies protesting employer clinic's discharge of another employee and asserting that such discharge was representative of mismanagement was protected because related to labor dispute and distinguishable from the type of public disparagement previously found to be unprotected; letter's tone was not malicious and employee's motive was not unpure).

## II. The October 1 Letter.

Appellant argues that the October 1 letter amounted to product disparagement, and, therefore, is undeserving of § 7 protection. We disagree. As both the ALJ and the Board concluded, under any of the various ways in which that concept has been applied over the years, the letter did not fall within the reach of the *Jefferson Standard* disloyalty exclusion and was not disparaging.

█ First and most important, there is no dispute that the letter was related to the labor dispute and to the employees' efforts to improve their working conditions.[9] This feature was central to the Supreme Court's reasoning in *Jefferson Standard*, and has continued to be the focus of NLRB and judicial analysis. *See, e.g., Misericordia Hospital Medical Ctr. v. NLRB*, 623 F.2d 808 (2d Cir.1980) (the challenged critical employee report related to the working conditions of the employees); *Community Hospital of Roanoke Valley, Inc. v. NLRB*, 538 F.2d 607 (4th Cir.1976) (employ-

ee nurse's complaint of hospital staff shortages was related to low pay); *Emarco*, 284 NLRB No. 91 (1987) (worker's remarks found to be expressly linked to the labor dispute); *Cordura Publications*, 280 NLRB No. 23 (1986) (letter was protected because it was part of and related to the ongoing labor dispute). Such a focus is appropriate. If unions are not permitted to address matters that are of direct interest to third parties in addition to complaining about their own working conditions, it is unlikely that workers' undisputed right to make third party appeals in pursuit of better working conditions would be anything but an empty provision. Moreover, extending § 7 protection in this direction does not pose an unreasonable threat to employers; third parties who receive appeals for support in a labor dispute will filter the information critically so long as they are aware it is generated out of that context.

The Company argues that the letter nevertheless must be characterized as disparaging because it charges that "circulation has plummeted, good employees have left for better jobs, and advertising has suffered." The Company is quite right that as far as advertisers are concerned, circulation is the product. Once again, however, the effect of *Jefferson Standard* was not to equate every critical comment with unprotected disloyalty. The letter must be evaluated in its entirety and in context.[10] The journalistic quality of the paper was not impugned, and, despite the criticisms voiced in the letter, the tone was both constructive and hopeful. The letter linked the decline of the newspaper to "these trying times of bargaining" and called on outside assistance in the effort to get the paper "back on track."[11]

---

**9.** The letter unambiguously was identified as arising out a labor dispute—it was written on union letterhead, signed by union members, and referred to failed contract negotiations—and the critical comments emphasized issues central to the labor dispute—the letter linked the decline of the newspaper to the failed contract negotiations and to employees' wages cuts.

**10.** *See, e.g., Cordura Publications*, 280 NLRB 23 (1986) (Employees' act of sending letter to parent corporation alleging shoddy practices in automobile collision research protected under

§ 7. Although the letter contained sharp criticism, "the thrust of the letter is the employees' proposal for increasing the professionalism of their jobs.")

**11.** The Company's reliance on cases which it claims found the employee communication to be so disparaging as to lose protection is unpersuasive. In *Coca Cola Bottling Works, Inc.*, 186 NLRB 1050 (1970), modified *sub nom. Retail, Wholesale and Department Store Union v. NLRB*, 466 F.2d 380 (D.C.Cir.1972) employees

In fact, there are several cases where employees used much sharper criticism or more inflammatory language, and yet the Board and courts found the communication protected by § 7. *See, e.g., Golden Day Schools, Inc. v. NLRB*, 644 F.2d 834 (9th Cir.1981); *Misericordia Hospital Medical Ctr v. NLRB*, 623 F.2d 808 (2d Cir.1980); *Emarco, Inc.*, 284 NLRB No. 91 (1987); *Cordura Publications, Inc.*, 280 NLRB No. 23 (1986); *Allied Aviation Svc. Co.*, 248 NLRB No. 26 (1980).

Appellant's efforts to distinguish these unfavorable precedents is unpersuasive. Appellant argues that *Emarco*, 4 NLRB 91, presents a different situation because the employee nurses made their critical comments during a television interview. Their activity was, according to appellant, "impulsive" behavior, which the NLRB forgives while the newspaper employees' writing and sending of the letter, was "calculated." Although the NLRB and courts are more lenient when the behavior is "impulsive," *Linn v. United Plant Guard Workers*, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966), *Kroger*, 284 NLRB 78 (1987), this was not the basis for the *Emarco* decision. And a television interview is not the sort of heated context that provokes the "impulsive" conduct contemplated by the cases.[12] Appellant suggests

that the Board in *Allied Aviation* was concerned not to chill employee disclosure of information related to airplane safety. However, the Board does not suggest this, and it is unlikely that consumer protection animates this area of labor law.

In *Golden Day Schools*, 644 F.2d 834, the court noted that although the child care workers' leaflet to parents included harsh language and serious charges about the care of the children, it fell "woefully short of the malicious tone" that would justify a discharge under *Jefferson Standard*. Appellant correctly points out that the court in *Golden Day Schools* determined that the leaflet played no part in the discharge of the employees. (They were illegally fired for their organizing efforts.) Appellant, however, overlooks the court's comment that the charges leveled in the leaflet were neither so malicious nor so unrelated to the labor dispute as to justify a discharge under *Jefferson Standard*.

 In reaching its decision, the Board also examined whether the employees were maliciously motivated, whether the letter was maliciously or recklessly false, and whether the letter harmed the Company. The relative weight to be given each of these factors can be debated,[13] but

---

distributed leaflets to the general public warning of the presence of foreign objects such as roaches and dead mice in the employer's soda bottles. The court, however, expressly declined to decide whether the leafleting was protected under § 7 because it reasoned that the Board's finding that the employer had condoned the leafleting obviated the need to reach the issue.

In *Kitty Clover, Inc.*, 103 NLRB No. 127 (1953), the NLRB found that striking workers' appeals to customers to boycott Kitty Clover food products was protected, as was their distribution of handbills which made "legitimate efforts" to present the Union's story to the customers. In contrast, the NLRB held that when four employees announced that Kitty Clover employed "diseased girls from North Sixteenth Street" and "skid row," such an unsubstantiated charge "passed the permissible limits" of protected activity.

In *American Arbitration Assn.*, 233 NLRB 12 (1977), the Board found that although the employee was engaged in concerted activity, the "immature" and unnecessarily ridiculing tone of the letters and questionnaire sent to the employer's lawyer-clients removed the protection. ("The questionnaire held the employer up to

ridicule by mentioning dogs and other animals in the same breath as lawyers and insurance adjusters.")

In contrast to these instances of fairly outrageous comments, the October 1 letter was not gratuitously ridiculing, but rather was reasoned and moderate. In addition, the communication in *Kitty Clover* was not directly related to the issues of the labor dispute, and the workers' action in *American Arbitration Assn.*, included contacting customers whose identity the ALJ found to be confidential.

**12.** Compare with, *Kroeger Co.*, which exemplifies bona fide impulsive behavior. (Employer unlawfully discharged employee who spoke out against employer moments after witnessing police remove union representatives from employer's deli.)

**13.** How much reliance to place on motive is problematic because of the Janus-like nature of legitimate and illegitimate intent. In *Richboro Community Mental Health*, 242 NLRB 1267, for example, the Board concluded that the employee's letter was protected because the purpose of

we conclude that the Board acted appropriately in considering them.[14] We further conclude that there is substantial evidence in the record to support the Board's determination that the October 1 letter was not maliciously motivated, recklessly false, or harmful to the Company.

■■■■ The Company also argues that product disparagement aside, the employees' conduct was otherwise so disloyal as to take it outside of the protection of § 7. The Company relies on *NLRB v. Red Top, Inc.*, 455 F.2d 721 (8th Cir.1972) as a "representative" case. There the Eighth Circuit overturned a Board order that found unlawful the discharge of employees because they had threatened to complain about the employer's management directly to one of the employer's customers. The Board held that to lose § 7 protection the employee misconduct must be "egregious." The Eighth Circuit relied solely on *Jefferson Standard* to reason that such a threat "did not constitute a bid for public sympathy or support, such as peaceful picketing, but was clearly designed to hit the employer where it could hurt, by interfering with its business relations with its customers." *Id.* at 727. This distinction is problematic for the same reason that the motive analysis is not entirely satisfactory; "a bid for public sympathy" and "interference with the employer's relations with its customers" in many cases may be a difference of expression rather than a substantive differ-

ence in conduct. Most third party appeals by unions that make a bid for public sympathy are effective to the degree that they engender public pressure on the company to alter some practice or demand, and that very creation of public pressure could be characterized as an interference with the employer's relations with its customers. The virtually paradigmatic case of peaceful picketing typically is designed to create economic pressure upon the employer. That, by its very nature, interferes with the employer's relations with its customers.

The *Red Top* court was influenced by other factors as well: the employee activity included threats of physical retaliation, and the Board had rejected without explanation the Trial Examiner's findings. To the extent the *Red Top* court may have concluded that § 7 protection should not extend to any activities "detrimental to the employer's business relationship except to the extent that such activities consist of lawful strikes," *id.* at 728, we reject its position as contrary to the overwhelming weight of authority.

■■■ The Company's claim that the October 1 letter is unprotected because it violated confidentiality is without merit. *American Arbitration Ass'n*, 233 NLRB 12 (1977) and *NLRB v. Knuth*, 537 F.2d 950 (9th Cir.1976), involved employee disclosure of truly confidential and sensitive information and contact with clients whose

---

the letter was not "to alienate the public's patronage as a tactic to increase the employee's leverage in the labor dispute," (citing *Jefferson Standard*), but rather was intended to remedy the disputed labor practice. It is obvious that most concerted activity could be described in such a way as to place it within either characterization. Nonetheless, motive, if discernible, may illuminate loyalty or disloyalty.

**14.** The parties dispute the relevance of the truth or falsity of the letter. We do not read the Board's decision as establishing an actual malice standard as a separate and independent requirement for removing § 7 protection from third party appeals, as the appellant claims. The Board reasoned that even if the Company is correct that the truth of the statements does not automatically bring the communication within § 7's protective mantle, the basis on which the employees made their statements is relevant to

assaying the good or bad faith which attended their communication.

The Board also was correct to question the legal relevance of the "apprehension of harm" factor. As the ALJ reasoned, much employee behavior could be harmful to an employer and yet not be disloyal or disparaging under *Jefferson Standard*. We agree with the Second Circuit's observation in *Misericordia Hospital Medical Ctr. v. NLRB*, 623 F.2d 808, 815 (1980) that " '[c]oncerted activity that is otherwise proper does not lose its protected status simply because [it is] prejudicial to the employer.' quoting *NLRB v. Circle Bindery, Inc.*, 536 F.2d 447, 452 (1st Cir.1979). To hold otherwise would ... be to ... render meaningless the rights guaranteed to employees by Section 7." In any event, there is ample evidence to support the Board's conclusion that, if the effects of the letter are at all a factor properly to be considered, the evidence of actual disruption is marginal, at best.

**220**

identities were confidential. Here, in contrast to *American Arbitration*, the identity of advertisers in The Union is known by the very presence of their advertisements in the newspaper. In addition, advertisers base their decisions of where to advertise in part on the circulation of the paper, and circulation figures are published by an industry service that is the print media counterpart to the Neilsen rating service. The October 1 letter made such general assertions that it is difficult to take seriously the Company's contention that confidential information was disclosed, particularly since the *Business Journal* had just published similar charges. Finally, Saucerman's undisputed testimony indicated that advertising salespeople used the threat of the paper's passing as a sales technique.

## CONCLUSION

■■■ In summary, the disloyalty standard is at base a question of whether the employees' efforts to improve their wages or working conditions through influencing strangers to the labor dispute were pursued in a reasonable manner under the circumstances. Product disparagement unconnected to the labor dispute, breach of important confidences, and threats of violence are clearly unreasonable ways to pursue a labor dispute. On the other hand, suggestions that a company's treatment of its employees may have an effect upon the quality of the company's products, or may even affect the company's own viability are not likely to be unreasonable, particularly in cases when the addressees of the information are made aware of the fact that a labor dispute is in progress. Childish ridicule may be unreasonable, while heated rhetoric may be quite proper under the circumstances. Each situation must be examined on its own facts, but with an understanding that the law does favor a robust exchange of viewpoints. The mere fact that economic pressure may be brought to bear on one side or the other is not determinative, even if some economic harm actually is suffered. The proper focus must be the manner by which that harm is brought about.

■■■ In this case, where long-term newspaper employees had accepted pay cuts because the paper claimed financial difficulty, where negotiations had continued for a long time with no results, and where the letter in question was directly and overtly related to a labor dispute and disclosed no significant confidences, there is substantial evidence to support the Board's finding that the means chosen by the employees were not so unreasonable as to lose § 7 protection on grounds of disloyalty.

We enforce the NLRB order.