Charles H. **HENDERSON**, Petitioner,

v.

**FEDERAL AVIATION ADMINISTRATION; National Transportation Safety Board, Respondents.**

**No. 91–70511.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 3, 1993.

Decided Oct. 18, 1993.

Lloyd B. Ericsson, Ericsson & Egan, Portland, OR, for petitioner.

Kathleen A. Yodice, F.A.A., Washington, DC, for respondents.

Before: TANG, POOLE and RYMER, Circuit Judges.

## OPINION

POOLE, Circuit Judge:

Petitioner Charles H. Henderson, a helicopter pilot, challenges the National Transportation Safety Board's sixty-day suspension of his commercial pilot license. The Board's action stemmed from Henderson's allegedly unsafe operation of his helicopter while transporting television journalists to photograph a derailed train in Corvallis, Oregon. We now affirm in part and reverse in part, and remand for a new penalty determination.

I.

Charles Henderson, a commercial helicopter pilot, provided helicopter services to a local television station in Springfield, Oregon. Henderson flew a Bell 206B helicopter, also known as a "Jet Ranger." In January 1988, the television station hired Henderson to fly two journalists over the site of a train derailment in Corvallis, Oregon, to take pictures. Henderson asked the journalists whether they wanted to remove the helicopter door, a common practice that makes it easier to photograph from the air. The journalists said removal of the door would not be necessary.

Once over the train site, however, the newsmen requested Henderson to land the aircraft, apparently because they were not getting the kind of pictures they wanted from the air. Henderson landed in a vacant lot, and the photographers walked to the train and took pictures. Then they took off again in the helicopter, taking more aerial photographs.

The Federal Aviation Administration alleges that Henderson's operation of the helicopter was extremely unsafe. It charges that Henderson operated the helicopter at altitudes and velocities which would make an emergency landing impossible without seriously endangering the lives and property of the people below. The FAA ordered Henderson's commercial pilot license suspended, and a hearing followed before an administrative law judge of the National Transportation Safety Board (NTSB).

Henderson represented himself at the hearing. He claims that the ALJ frequently interrupted and admonished him. The hearing showed that Henderson flew his helicopter extremely slowly and at very low altitudes over a congested residential area of Corvallis. An experienced helicopter pilot testified that had the helicopter lost power, a fatal accident would have occurred. He also testified that Henderson did not exercise reasonable judgment in flying as he did.

The ALJ concluded that Henderson violated three aviation safety regulations. He found Henderson had violated 14 C.F.R. sections 135.203(b) (forbidding flying a helicopter over a congested area at less than 300 feet), 91.79(a) (forbidding flying an aircraft at too low an altitude to effect an emergency landing should the aircraft lose power), and 91.9 (forbidding operation of an aircraft in a "careless or reckless manner"). In an appeal to the full NTSB, the Board affirmed these rulings. It ordered Henderson's commercial pilot license suspended for 60 days.

Henderson brought this timely appeal of the NTSB's decision. He argues first that the 14 C.F.R. § 135.203(b) charge was erroneous as a matter of law. He points out that none of the safety rules contained in Part 135—i.e., 14 C.F.R. § 135 et seq.—apply to flights for "aerial photography or survey." See 14 C.F.R. § 135.1(b)(4)(iii) ("This part does not apply to ... Aerial work operations, including— ... Aerial photography or survey"). If Henderson's flight is deemed one for "aerial photography," none of the Part 135 regulations apply to him, and the 135.1 violation will have to be reversed.

As to the other safety regulations with which Henderson was charged—sections 91.9 and 91.79—Henderson claims that the NTSB's finding of violations was contrary to precedent.

As explained below, Henderson is right about the aerial photography exception to Part 135. Those regulations do not apply to Henderson's flight, and the NTSB's contrary conclusion must be reversed. But Henderson is incorrect that NTSB precedent compels reversal of his Section 91.9 and Section 91.79 violations.

## II.

Henderson argues that because his flight was for the purpose of aerial photography, it is exempt from the requirement, contained in 14 C.F.R. § 135.203(b), that helicopters not be flown less than 300 feet above congested areas. The FAA agrees that aerial photography flights are exempted from Section 135.203's requirements, but claims that because Henderson landed in Corvallis, the flight took on the status of commercial air transportation, which, in contrast to aerial photography operations, is specifically subject to Part 135's requirements. 14 C.F.R. § 135.1(a)(3).

■ Our review of the NTSB's decisions is narrow: "[W]e will uphold such decisions unless they are 'arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law.' The NTSB's factual findings are conclusive when supported by substantial evidence in the record. Purely legal questions are reviewed de novo." *Essery v. DOT*, 857 F.2d 1286, 1288 (9th Cir.1988) (citations omitted).

"Substantial evidence" means "such relevant evidence as reasonable minds might accept as adequate to support a conclusion[,] even if it is possible to draw two inconsistent conclusions from the evidence." *NLRB v. International Bhd. of Elec. Workers, Local 1547*, 971 F.2d 1435, 1436 (9th Cir.1992) (internal quotations omitted). While this standard is "relatively deferential to the agency as fact-finder, review must still be searching and careful." *Sierra Publishing Co. v. NLRB*, 889 F.2d 210, 215 (9th Cir.1989).

Henderson further insists that he did not know there was to be a landing of the helicopter until he and the television journalists were already airborne. He asserts that so far as he knew, the flight was for aerial photography only, and therefore it qualified for the aerial photography exemption from Part 135. The FAA responds that the flight was taken with the mixed purpose of aerial photography *and* landing, and that such mixed purpose flights do not qualify for the aerial photography exemption.

■ The FAA is incorrect. If a pilot knows, prior to departure, that in addition to aerial photography the passengers also desire a landing, the flight is not exempt from Part 135. *Helms v. Bryan*, 4 N.T.S.B. 1166 (1983); *Busey v. Reed*, No. SE–8649, 1990 WL 339006 (NTSB February 19, 1990). But where a pilot hired for aerial photography finds out only in the air that the passengers desire a landing, the aerial photography exception applies. *Helms v. Southeast Air, Inc.*, 4 N.T.S.B. 517 (1982), *aff'd*, 732 F.2d 139 (1st Cir.1984).

For example, in *Southeast Air*, an airplane pilot took a television crew over Nantucket Island for aerial photography of the island. After circling in the air for a while, one of the newsmen requested a landing, and the pilot complied. The aircraft was on the ground for several hours as the newsmen conducted interviews and took pictures. Both before and after the landing, the news crew took aerial photographs.

The NTSB held that despite the landing, the flight still qualified for the aerial photography exception. Noting that the "flight was booked as an aerial photography flight and so understood by [the pilot]" prior to takeoff, the Board said that it "cannot accept the [FAA's] position that a landing . . . takes the flight out of the aerial photography exception." *Southeast Air*, 4 N.T.S.B. 517.

Thus, the only question in the present case is whether Henderson knew before takeoff that the helicopter flight was for more than aerial photography.

The NTSB did not correctly apply this principle. In ruling the aerial photography exemption inapplicable to Henderson's flight, it stated that

[e]ven if the respondent did not actually have prior knowledge of his passenger's [sic] desire to land in order to take pictures and interview witnesses on the ground at the derailment site, *he learned of this intent before he landed the aircraft*.

*Busey v. Henderson*, No. SE–9549, 1991 WL 320154 (NTSB June 12, 1991) ("NTSB Op.") (emphasis added).

If by this statement the NTSB meant to suggest that even where a pilot does not learn of an intended landing until after takeoff, the flight nevertheless may be disqualified from the aerial photography exception, it was clearly mistaken. Pilots will always know of a landing at some point before it occurs. If that were enough to disqualify a flight from the aerial photography exception, it would erase the rule applied in *Southeast Air*, and recognized in *Reed* and *Bryan*, that landings unanticipated before takeoff do not remove photographic flights from the aerial photography exception.

■ If, on the other hand, the NTSB's point was that where a pilot learns of a landing mid-flight, he or she may not *thereafter* engage in aerial activity violative of Part 135, the NTSB has drawn a distinction not found in the case law. *Southeast Air, Reed,* and *Bryan* speak only of a pilot's knowledge prior to departure. Where plans for a landing are unknown before departure, the flight is exempt from Part 135 no matter when during flight the pilot learns of the plans.

■ The NTSB also stated that even if Henderson was correct that only pre-departure knowledge is relevant, his flight was still ineligible for the aerial photography exception because even before departing he "knew or should have known . . . that more than 'aerial photography' was contemplated." NTSB Op. at 6 n. 9. The NTSB found that because Henderson arranged the helicopter flight himself, he should have known of its purposes; and it found that Henderson's failure to remove the helicopter door for the flight, a step which would have improved the quality of aerial photography, showed Henderson knew that a landing to remove the door would be needed. *Id.*

We conclude that these findings were not supported by substantial evidence. First, the NTSB's "should have known" standard is not found in the case law. *Southeast Air, Reed,* and *Bryan* all relied on actual, not imputed, knowledge.[1] Second, the only evi-

1. It is true that in *Bryan*, the NTSB stated that the pilot "should have been aware" that his flight would not come within the aerial photography exception. 4 N.T.S.B. 1166. But the NTSB had already found that the pilot in fact knew of the flight's dual purpose. The NTSB's statement

dence in the record about Henderson's actual knowledge of an intended landing is his own testimony that the request came after take-off. Third, the camera crew specifically requested that Henderson not remove the helicopter door, informing him that they would "take the pictures out through the window." The fact that Henderson acceded to this request is not substantial evidence of his actual knowledge of a landing.

Hence, the NTSB's conclusion that the flight did not qualify for the aerial photography exception cannot stand. We therefore reverse the NTSB's determination that Henderson violated Part 135.

## III.

■ Henderson, who appeared before the NTSB's administrative law judge pro se, also argues that the judge deprived him of due process by stifling, interrupting, and intimidating him.

"Whether the conduct of [a] hearing violated the due process clause of the fifth amendment is a question of constitutional law that we review de novo." *Pavlik v. United States,* 951 F.2d 220, 223 (9th Cir.1991).

In his brief, Henderson excerpts a host of exchanges between himself and the ALJ designed to demonstrate his unfair treatment at the hearing. For example, the ALJ often interrupted and admonished Henderson. But these exchanges show at most that the ALJ was often abrupt, and occasionally rude, to Henderson. Henderson does not show how these interchanges so severely interfered with the fairness of his hearing as to deprive him of due process. Accordingly, we reject Henderson's due process argument.

## IV.

Finally, Henderson disputes the NTSB's conclusion that his operation of the helicopter created an "undue hazard" in violation of 14 C.F.R. §§ 91.9 and 91.79(a).[2] The NTSB's factual determinations on this issue must be affirmed if based on substantial evidence in the record. *Essery v. DOT,* 857 F.2d 1286, 1288 (9th Cir.1988).

Section 91.9 provides:

No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another.

Section 91.79 provides:

§ 91.79 *Minimum safe altitudes; general*

Except when necessary for takeoff or landing, no person may operate an aircraft below the following altitudes:

(a) *Anywhere.* An altitude allowing, if a power unit fails, an emergency landing without undue hazard to persons or property on the surface.

Henderson cites *Carman v. McArtor,* No. SE–6838, 1988 WL 250283 (NTSB February 17, 1988), as holding that the chances of a Bell 206B Jet Ranger helicopter having an accident are extremely remote, and he concludes that his low-altitude flight therefore could not pose undue risk under either Section 91.79(a) or Section 91.9. This argument fails both as to the Section 91.79 and the Section 91.9 violation.

### A. *The Section 91.79 Violation*

■■ First, the NTSB's finding in *Carman* that the Bell 206B helicopter was exceptionally safe was not made in connection with

that the pilot should have known his flight was ineligible for the aerial photography exception was not a finding in support of its decision, but an observation stemming from its finding that the pilot had, in fact, known of the dual purpose. Here, no evidence showed that Henderson in fact knew of a dual purpose, and the dictum in *Bryan* is irrelevant.

In any event, the pilots' preflight knowledge was significant in *Bryan, Reed* and *Southeast* because in each of those cases the NTSB was asked to determine whether the pilots had intended to evade Part 135, under which they were not licensed to transport passengers, by attempt-

ing to force de facto commercial transportation into the aerial photography exception. If the pilot knew before the flight that a landing was planned, it was clear that some form of unlicensed transportation was involved. Because Henderson was licensed, there is no such concern here.

2. These are the citations used by the parties. Because of a reorganization of the Code of Federal Regulations, these sections now appear, with identical text, at 14 C.F.R. §§ 91.13 and 91.-119(a), respectively.

a Section 91.79 violation, but a Section 91.9 violation. Section 91.79, unlike Section 91.9, says that, *assuming* a power unit fails, there must be ample altitude for an emergency landing. How likely it is that a power unit will fail is not relevant to a Section 91.79(a) determination. What matters is whether there is enough altitude for an emergency landing *if* it fails. Hence the safety statistics of the Bell 206B helicopter are irrelevant to the Section 91.79(a) charge. The NTSB accepted the ALJ's finding that should there have been a power failure, there would have been a dangerous or even fatal accident. Because this finding was based on substantial evidence in the record—including eyewitness and expert testimony—it must be affirmed.

### B. *The Section 91.9 Violation*

■ For the NTSB to find Henderson operated his aircraft "in a careless or reckless manner" in violation of Section 91.9, it must find that there would be harm in the event of an accident, and either that "(1) the likelihood of such harm was unacceptably high or (2) the pilot's exercise in judgment was clearly deficient." *Carman,* 1988 WL 250283 at *4.

*Carman* involved Section 91.9 charges against the operator of a Bell 206B helicopter, the same aircraft Henderson flew. In analyzing whether the likelihood of a harmful accident was unacceptably high, the court did, as Henderson notes, conclude that "the statistical probabilities of an accident occurring in this model helicopter are extremely remote." *Id.* However, the other *Carman* factor is whether "the pilot's exercise of judgment was clearly deficient." *Id.* Here, the ALJ found, and the NTSB affirmed, that in flying the helicopter at an extremely slow speed very low over a congested residential area, Henderson's conduct "did not represent a reasonable judgment for a helicopter pilot." NTSB Op. at 7. Accordingly, the Section 91.9 violation must be affirmed.

The NTSB's sustention of the Section 91.-79(a) and 91.9 violations are AFFIRMED. Its decision that Henderson violated Part 135 is REVERSED, and the case is remanded

for a new penalty determination in light of this decision.