**M.P.C. PLATING, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 91–5608.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 22, 1991.

Decided Jan. 14, 1992.

William L.S. Ross briefed and argued, Donald F. Woodcock briefed, Calfee, Halter & Griswold, Cleveland, Ohio, for petitioner.

Aileen A. Armstrong, Deputy Associate Gen. Counsel, Eric G. Moskowitz briefed, Margery E. Lieber, Dean L. Burrell argued, N.L.R.B., Office of the Gen. Counsel, Washington, D.C., Frederick Calatrello, Director, N.L.R.B., Cleveland, Ohio, for respondent.

Before JONES and MILBURN, Circuit Judges, and ENGEL, Senior Circuit Judge.

MILBURN, Circuit Judge.

Petitioner-appellant M.P.C. Plating, Inc. ("M.P.C.") appeals a National Labor Relations Board ("Board") order denying its request for attorney fees under the Equal Access to Justice Act ("EAJA"), 5 U.S.C. § 504.[1] On appeal, the principal issue is whether the General Counsel for the Board was substantially justified in litigating two alleged violations of the National Labor Relations Act, 29 U.S.C. § 151 *et seq*. The first concerned a claim that certain temporary employees of M.P.C. were denied the opportunity for permanent employment because of their union sympathies, and the second concerned a claim that employee picket line misconduct was not such as to bar the pickets from reinstatement with back pay. For the reasons that follow, we enforce the Board's order in part and reverse and remand in part.

I.

M.P.C. Plating, Inc. is a small business engaged in plating, buffing, and polishing metal parts. It is wholly owned by its president, Albert Walcutt. His wife, Rozeanne Walcutt, is the secretary-treasurer of the corporation. During the relevant time period, the company employed approximately thirty production and maintenance workers. Approximately fourteen workers were permanent employees of the company. The remaining number were temporary employees supplied by an unrelated temporary personnel agency, Ger–Mar Temps ("Ger–Mar").

Ger–Mar supplied temporary workers on an "as needed" basis. Although there was no formal policy providing for the transfer of Ger–Mar temporary employees to the status of permanent employees of M.P.C., it was a fact that on July 23, 1985, eight of M.P.C.'s fourteen permanent employees had once been temporary referrals from Ger–Mar. The temporary employees performed approximately the same functions as the company's permanent employees and were paid the minimum wage of $3.30 per hour, somewhat less than the wage received by M.P.C.'s permanent employees. The permanent employees also received certain fringe benefits such as hospitalization insurance, life insurance, a paid vacation, and a profit sharing plan, none of which were available to the Ger–Mar temporaries.

In late June 1985, Rashad Shareef, a permanent employee of M.P.C., began promoting the idea of an employee union by talking to other employees and contacting agents of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America ("union" or "Teamsters"). When Mr. and Mrs. Walcutt learned of this activity, they told Shareef they would shut the plant down rather than

---

1. The labor issues in this case were decided in *M.P.C. Plating, Inc. v. N.L.R.B.*, 912 F.2d 883 (6th Cir.1990).

let a union in. They and their supervisors then began interrogating various employees about union organizing. An employee who was overheard discussing the union was fired.

The union moved quickly, and by July 22, 1985, it had obtained authorization cards from thirteen permanent employees of M.P.C. and nine Ger–Mar temporary workers. On July 23, 1985, the Walcutts informed Ger–Mar that it wished to transfer all its permanent employees to Ger–Mar's payroll as temporary employees, a move that would result in the permanent employees' loss of important fringe benefits. On the same day, Albert Walcutt issued an ultimatum to his employees, *viz.*, that they should accept transfer to temporary status as a Ger–Mar employee or be fired.

On July 24, 1985, Walcutt unsuccessfully attempted to have Ger–Mar prepare letters falsely memorializing fictitious meetings between Ger–Mar and M.P.C. prior to the union organizing drive. On that same day he also refused to sign a letter acknowledging the union as the collective bargaining representative of M.P.C. employees. All the employees who refused to transfer to temporary status with Ger–Mar were locked out of M.P.C.'s plant.

In response to these actions, M.P.C. employees and Ger–Mar temporary workers began protesting and picketing outside the M.P.C. plant. The strike lasted several months and "unquestionably involved numerous instances of blocking of ingress and egress to the facility and acts of violence." Brief of Appellee at 9.

On August 23, 1985, Teamsters Local Union No. 507 filed unfair labor practice charges with the National Labor Relations Board, alleging that M.P.C. had committed violations of the National Labor Relations Act. The General Counsel of the Board issued an unfair labor practice complaint on September 16, 1985. Over two years later, on December 8–11, 1987, and January 11–14, 1988, hearings were conducted before an administrative law judge ("ALJ") who issued a decision on June 6, 1988, holding that the General Counsel had prevailed on most, though not all, of his unfair

labor practice allegations. Specifically, the ALJ found that M.P.C. violated 29 U.S.C. § 158(a)(1), (3), by engaging in surveillance and interrogation of employees regarding union activities, by making retaliatory threats against employees interested in union organizing, and by discharging employees because of their support of the union. The ALJ also held that M.P.C. constructively discharged its permanent employees on July 24, 1985, in violation of 29 U.S.C. § 158(a)(1), (3), by conditioning their continued employment upon their transfer to Ger–Mar, an action that was intended to eliminate the necessity of dealing with the union and which constituted a retaliation against M.P.C.'s work force in the form of a complete abrogation of its fringe benefits. The ALJ described these violations of the National Labor Relations Act as "outrageous or pervasive."

The ALJ, however, rejected two of the allegations made in the General Counsel's complaint. First, she held that the General Counsel had not shown that Ger–Mar temporary employees were denied the opportunity for full-time, permanent employment with M.P.C. when M.P.C. constructively discharged its permanent work force. She noted that M.P.C. had initiated a hiring freeze in June 1985, and that there was "scant" evidence that Ger–Mar temporary employees would normally attain any permanent employment status at M.P.C. Second, she found against the General Counsel on his claim that M.P.C. had unlawfully discharged certain employees for picket line misconduct in blocking access to M.P.C.'s plant. On June 15, 1989, the Board affirmed and adopted the decision of the ALJ on the merits of the alleged violations.

As the result of being the "prevailing party" with respect to two of the claims made by the General Counsel, M.P.C. filed an application for attorney fees under 5 U.S.C. § 504. On January 8, 1990, the ALJ issued an interim order awarding attorney fees to M.P.C. because the General Counsel's position on the denial of opportunity issue was not substantially justified. As to the issue concerning the discharge of the

strikers for misconduct on the picket line, the ALJ found that the General Counsel's position was substantially justified, and she refused to award attorney fees. After a motion to reconsider by the General Counsel, the ALJ issued a final order on March 28, 1990, in which she set aside her interim order and found that the General Counsel's position was substantially justified as to both the "denial of opportunity" and "strike misconduct" issues.

M.P.C. filed exceptions to this decision, and the Board overruled them on February 19, 1991, when it adopted the ALJ's decision in its entirety. M.P.C. then filed a petition in this court for leave to appeal the NLRB's failure to make an award of attorney fees. On May 15, 1991, this court granted the petition.

## II.

### A.

The scope of review in this case is established by 5 U.S.C. § 504(c)(2), which provides that this "court may modify the determination of fees and other expenses only if the court finds that the failure to make an award of fees and other expenses, or the calculation of the amount of the award, was unsupported by substantial evidence."

The standard for determining whether attorney fees should be awarded to a prevailing party in an adversary adjudication before an agency is found at 5 U.S.C. § 504(a)(1) which provides:

> An agency that conducts an adversary adjudication shall award, to a prevailing party other than the United States, fees and other expenses incurred by that party in connection with that proceeding, unless the adjudicative officer of the agency finds that the position of the agency was substantially justified or that special circumstances make an award unjust.

An agency's position is "substantially justified" if it is

> "justified in substance or in the main"— that is, justified to a degree that could satisfy a reasonable person. That is no

different from the "reasonable basis both in law and fact" formulation....

*Pierce v. Underwood,* 487 U.S. 552, 565, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988).

### B.

■ M.P.C. argues that picket line misconduct by the strikers, involving some violence and the blocking of non-striking employees' access to the plant, constituted strike misconduct that would justify their firing and M.P.C.'s refusal to reinstate them. In particular, M.P.C. contends that two cases, *Clear Pine Mouldings, Inc.,* 268 N.L.R.B. 1044 (1984), *enforced,* 765 F.2d 148 (9th Cir.1985), and *Tube Craft, Inc.,* 287 N.L.R.B. No. 51 (December 16, 1987), hold that strikers blocking access to a company's plant engage in strike misconduct and thereby forfeit their rights to reinstatement upon a resolution of the strike. M.P.C. further contends that, even before the General Counsel filed his initial complaint in this matter, M.P.C. had provided the General Counsel with a video tape that showed concerted activity by the strikers aimed at blocking nonstriking employees from access to the plant. Thus, M.P.C. argues, the General Counsel knew that case law permitted the discharge, without right of reinstatement, of strikers for blocking access to an employer's facility, and he knew from the video tape that these strikers had engaged in exactly that kind of misconduct. Therefore, M.P.C. concludes, the General Counsel could not be substantially justified in prosecuting to a conclusion his claim that the blockading pickets were entitled to reinstatement.

The ALJ found that the General Counsel's position was substantially justified because *Clear Pine Mouldings,* a 1984 decision, had not directly held that the mere blocking of access to a facility could constitute picket line misconduct. Therefore, the General Counsel, when he reissued his amended complaint in 1988, was justified in taking the position that those strikers who did no more than block access to the plant could be reinstated.

The ALJ also noted that *Tube Craft*, which *did* directly hold that blocking access to an employer's facility was strike misconduct justifying termination and forfeiture of reinstatement rights, was not decided until after the first week of trial in this case. She then concluded that it was proper for the General Counsel, having filed his complaint with substantial justification, to proceed with litigation then in progress despite the appearance of *Tube Craft* because of another controlling principle in labor law first established in *NLRB v. Thayer Co.*, 213 F.2d 748 (1st Cir.), *cert. denied*, 348 U.S. 883, 75 S.Ct. 123, 99 L.Ed. 694 (1954). In *Thayer*, the First Circuit held that the Board, whenever considering questions of reinstatement for picketing employees, should

> balance the severity of the employer's unfair labor practice which provoked the industrial disturbance against whatever employee misconduct may have occurred in the course of the strike. Thus in reaching its decision the Board weighs two groups of facts.

*Id.* at 755. Because the ALJ had found M.P.C.'s anti-union conduct in this case to be egregious and a flagrant violation of the National Labor Relations Act, she held that it was justifiable for the General Counsel to press for reinstatement of strikers who merely blocked access to the facility on the grounds that their conduct, when balanced against the possibly more egregious conduct of the employer, would not deprive them of their rights to reinstatement. Thus, in a dispute of this type, the outcome must await a balancing process which only the trier of fact could accomplish.

There is substantial evidence to support the Board's conclusion that the General Counsel's position in this regard was substantially justified. When the General Counsel filed his complaint in this case, *Clear Pine Mouldings* was the leading case dealing with picket line misconduct. That case holds that verbal threats of physical violence against nonstriking employees disqualify the offending pickets for reinstatement. Two of the members of that court joined in an analysis that concluded:

> We believe it is appropriate, at this point, to state our view that the existence of a "strike" in which some employees elect to voluntarily withhold their services does not in any way privilege those employees to engage in other than peaceful picketing and persuasion. They have no right, for example, to threaten those employees who, for whatever reason, have decided to work during the strike, to block access to the employer's premises, and certainly no right to carry or use weapons or other objects of intimidation.

*Clear Pine Mouldings*, 268 N.L.R.B. at 1047. The other two members of the court, however, joined only to concur in the view that the older Board rule was wrong insofar as it held that a verbal threat could never justify denial of reinstatement in the absence of physical gestures. They specifically declined to adopt the above-mentioned reasoning of the other members, "including their analysis of the right to strike, Section 8(c) of the Act, and the legislative history of the Act." *Id.* at 1049. Thus, half of the court in *Clear Pine Mouldings* did not agree that the blocking of access to an employer's premises amounted per se to strike misconduct. Therefore, in light of the rationale in *Thayer* allowing balancing of a picket's misconduct against the employer's misconduct, the General Counsel was justified in filing his complaint and adopting the litigating position he did. The divided holding in *Clear Pine Mouldings* does not render his position unreasonable in law.

M.P.C. also argues that the advent of *Tube Craft* during the trial of this case rendered General Counsel's continued prosecution of this claim unjustifiable. After *Tube Craft* was decided on December 16, 1987, the trial of this case recommenced on January 11, 1988, and the video tape was offered in evidence by M.P.C. to show the misconduct of the pickets. As the misconduct, including the blocking of access, was demonstrated by the video tape and the live testimony accompanying its admission, the General Counsel continuously amended his complaint by eliminating claims for the reinstatement of pickets engaged in blocking access. Nevertheless, M.P.C. argues that

the General Counsel did not surrender quickly enough.

The ALJ held that, even after the parties became aware of *Tube Craft*, "a valid question remained as to whether the strikers' conduct was offset by the severity of the Respondent's unfair labor practices." Thus, the *Thayer* balancing requirement allowed the General Counsel to argue that M.P.C.'s unfair labor practices were so egregious that certain striking employees were entitled to reinstatement despite their comparatively mild misconduct in blocking access to the plant. The General Counsel, therefore, could reasonably have believed that it was necessary to provide the ALJ with a full view of the evidence in question.[2]

M.P.C. argues that the *Thayer* doctrine, as applied by the ALJ in this case, has been discredited and is no longer the law. Therefore, it could not serve to justify General Counsel's position. It is true that two members of the court in *Clear Pine Mouldings* seemingly rejected the *Thayer* doctrine, although not by name.

> In deciding whether reinstatement should be ordered after an unfair labor practice strike, the Board has in the past balanced the severity of the employer's unfair labor practices that provoked the strike against the gravity of the striker's misconduct. We do not agree with this test.

268 N.L.R.B. at 1047 (footnote omitted). As previously stated, however, the other two members of the court disagreed with this analysis and refused to adopt it. *Id.* at 1049. Thus, the Board may have "opened fire" on the *Thayer* doctrine, but it is problematic as to whether any damage was done to it. The doctrine was not mentioned

by name, and the critical portion of the opinion was not adhered to by half of the Board.

In any event, the *Thayer* doctrine appears to be more than an old fossil of "rambling dicta," as M.P.C. characterizes it. Its vitality has been reaffirmed in *Mosher Steel Co. v. NLRB*, 568 F.2d 436, 441 (5th Cir.1978), and in *Golden Day Schools, Inc. v. NLRB*, 644 F.2d 834, 840 (9th Cir.1981). More recently, the doctrine was thought to be alive by the court in *A.P.A. Warehouses*, 291 N.L.R.B. No. 94 (November 10, 1988). Given these recent references to the doctrine, it cannot fairly be said that *Clear Pine Mouldings* abandoned the *Thayer* doctrine. Therefore, the ALJ appropriately relied on the doctrine as a justification for the General Counsel's actions in the case.

Because it was not firmly established, until late in these proceedings, that blocking of access to an employer's plant was unprotected strike misconduct, and because the *Thayer* doctrine allows the balancing of employer-employee misconduct in circumstances such as those found in this case, we conclude that the Board's determination that the General Counsel's litigating position was substantially justified is supported by substantial evidence.

## C.

■ Finally, M.P.C. argues that the General Counsel was not substantially justified in prosecuting that portion of his complaint which alleged that M.P.C. denied certain Ger–Mar temporary employees the opportunity for full-time, permanent employment because of their attraction to the union. According to the ALJ, the General Counsel's theory was that "by disbanding the

---

**2.** M.P.C. argues that the *Thayer* doctrine was never raised, or even mentioned, by the General Counsel while the strike misconduct allegations were pending. Brief of Appellant at 28. It therefore concludes that the doctrine never entered the General Counsel's mind and was not, in fact, a factor in his decision to continue the prosecution of this claim. This argument contains an implicit assertion that these matters should be decided on a subjective view of a particular attorney's state of mind. That analysis is more appropriate to cases involving puni-

tive sanctions, not attorney fee awards. Furthermore, the question in this case is whether the General Counsel's position was reasonable in law, not whether he knew precisely why it was. The objective standard of reasonableness better suits the standards applicable to this kind of case than does a subjective standard designed to measure counsel's actual knowledge. From the facts of this case, this court cannot determine whether the General Counsel may have had the *Thayer* doctrine in mind or not at the time of the merits hearing.

full-time workforce for discriminatory motives, the Respondent [M.P.C.] thereby denied the Ger–Mar employees any opportunity they may have had to become full-time employees." The facts in this case show that M.P.C. did hire some Ger–Mar temporary employees and placed them on its permanent payroll. As of July 1985, eight of its fourteen permanent employees had begun their employment at M.P.C. as Ger–Mar temporaries. Other than this course of conduct, however, there was no evidence presented to show that any of the Ger–Mar temporaries working at M.P.C. in July 1985 had any expectation of being shifted to M.P.C.'s permanent payroll. There was no evidence that any of these temporary workers had ever applied for permanent employment at M.P.C., and no temporary worker testified at the hearing as to a real or perceived lost opportunity of any kind. The lost opportunity, if any, was entirely theoretical.

In determining not to award attorney fees on this claim, the ALJ relied on *Service Operations Systems*, 272 N.L.R.B. 1033 (1984), as establishing a departure point from which the General Counsel could, in good faith, advance novel but credible extensions of the law. In *Service Operations Systems*, a janitorial service bid for and won a contract to clean the Federal Office Building in Denver, Colorado. Through the years, eight different contractors had been awarded this GSA contract, and all had hired the employees of the preceding contractor. When *Service Operations Systems* was awarded the contract, its owner developed an antipathy to the union representing the employees of the previous contractor. He determined not to hire them, and when they arrived en masse to submit applications for employment, he told them falsely that application forms were not available. They left their names and addresses as substitutes for written applications. The owner's comments to many of the employees and their union representatives made it clear that he would not hire any member of the previous crew who was affiliated with the union.

■ *Service Operations Systems* stands for the proposition that an employer may not, out of anti-union animus, refuse to consider hiring employees who would and did apply for available positions. To remedy this violation of law, the Board directed the employer to offer employment to all employees of the former contractor. The exact questions of what jobs would have been available absent the anti-union prejudice, which applicants were qualified to fill them, and what back pay should be awarded were left to a subsequent compliance proceeding.

*Service Operations Systems* is distinguishable from this case in that the employees of the former contractor actually applied for employment with the successor contractor. They indicated a willingness to work for that contractor, but he refused to consider them because of their union affiliation. In this case, however, there is absolutely no proof that any Ger–Mar temporary employee had applied or attempted to apply for a permanent position at M.P.C. The fact that eight of the fourteen permanent employees made their start at M.P.C. as Ger–Mar temporaries does not prove that the Ger–Mar temporary employees mentioned in the General Counsel's complaint were denied anything. Because there was proof in *Service Operations Systems* that the employees had applied, or tried to apply, for continuation in their jobs, it was possible for the Board to find that they had been refused something they were entitled to—fair consideration—because of an employer's discriminatory animus. In this case, however, it is not possible to say that any Ger–Mar temporary employee was refused or denied anything. Even if it were theoretically possible to say that what the temporary employees were denied was an unfounded expectation of future permanent employment, there is still no proof in the record evidencing any such expectations. Thus, there is little factual or legal support for this position.

It may be, as in *Service Operations Systems*, that questions of back pay, job availability, and seniority considerations can be left to compliance proceedings where it can be established that an applicant has been

refused consideration of employment because of his union sympathies. In this case, the Board suggests leaving the very question of whether a Ger–Mar temporary employee *might* have applied for a permanent job at M.P.C. to a compliance determination. Yet, that is one of the elements the General Counsel had the burden of proving in order to establish in the first place that there had been a denial of something. His failure to prove that any Ger–Mar temporary employee had applied for a permanent position at M.P.C. or that a temporary employee had even an expectation of receiving a permanent position amounts to a complete failure to prove that M.P.C.'s conduct denied an employment opportunity to these temporary employees.

This failure of evidence, together with a failure to provide any legal precedent for the General Counsel's position, indicates that the standards for "substantial justification" have not been met. Both factual and legal underpinnings of the position are shaky, and it cannot be said that the position is justified "in the main." *Pierce*, 487 U.S. at 565, 108 S.Ct. at 2550. Accordingly, there is no substantial evidence supporting the Board's conclusion in this regard, and, therefore, we conclude that it should be set aside.

### III.

For the foregoing reasons, the Board's order is ENFORCED insofar as it denies an award of attorney fees in regard to the strike misconduct issue. However, the Board's order is REVERSED and REMANDED for an award of attorney fees with respect to the denial of opportunity issue.